The STATE of Texas ex rel. Charles A. ROSENTHAL, Jr., District Attorney of Harris County, Relator,

v.

The Honorable Ted POE, Judge 228th District Court of Harris County, Respondent.

No. 74515.

Court of Criminal Appeals of Texas.

Feb. 12, 2003.

Charles L. Babcock, Houston, for Appellant.

William J. Delmore, III, Asst. DA, Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

HERVEY, J., delivered the opinion of the Court in which PRICE, WOMACK, HOLCOMB, and COCHRAN, JJ., joined.

This is an original mandamus proceeding. Relator seeks a writ of mandamus directing respondent to vacate a portion of his order authorizing the videotaping of jury deliberations in a capital murder trial in respondent's court. We will conditionally grant mandamus relief.

The record reflects that after carefully considering and weighing the parties' interests, Respondent signed an order permitting WGBH Educational Foundation, Mead Street Films, Inc., and the PBS television program *Frontline* (collectively referred to as "Co–Production") to videotape for later public broadcast, all of the proceedings (including jury deliberations) in the capital murder trial of Cedric Ryan Harrison, Cause Number 913,903 in the 228th District Court of Harris County.[1] As part of his order authorizing the videotaping, respondent found that Co–Production "has demonstrated seriousness of purpose and committed significant resources

---

1. Respondent makes the unchallenged factual assertion in his brief that the interested parties to this proceeding, including relator, "discussed [the] parameters and procedures of the filming process for several months before the start of trial," with no objection from relator. The record before the Court indicates that relator first lodged an objection "to the filming of all proceedings" three days before the commencement of jury selection. Respondent does not claim that relator has procedurally defaulted the claim (videotaping the jury deliberations) raised in this proceeding.

to this public educational endeavor and is uniquely deserving of the exclusive right to broadcast the footage it records." Unattended cameras and sound recording equipment will record the jury deliberations with no one from Co-production present in the jury room during these deliberations. Respondent has taken other measures to ensure that none of the proceedings will be broadcast "until after the conclusion of all matters in the trial court."

The record further reflects that Respondent did not authorize the videotaping of the proceedings until after having carefully questioned Mr. Harrison and his lawyer about Mr. Harrison's decision to consent to the videotaping and being satisfied that Mr. Harrison freely consented to it. The record also reflects that Mr. Harrison waived in writing, any statutory or constitutional right to use any of the recordings "as evidence in a motion for new trial, on direct appeal, or in post-conviction proceedings in state or federal court" and to use any of the recordings "as evidence of error or misconduct that may occur during trial and jury deliberations." Mr. Harrison also acknowledged in writing his understanding "that recorded jury deliberations cannot be used in a motion for new trial, direct appeal, or post-conviction proceedings pursuant to Texas and Federal Rule of Evidence 606(b)." Mr. Harrison's attorney asserted in writing that Mr. Harrison's waiver "was executed voluntarily and freely" and that Mr. Harrison was "competent to make such waiver." Mr. Harrison's mother stated in writing that she had consulted with Mr. Harrison "regarding [his] waiver" and she consented in

writing "to the filming of trial and jury deliberations." [2]

When jury selection proceedings began, each veniremember was required to fill out a juror questionnaire form which asked the veniremember whether videotaping the proceedings to be aired for public television purposes after the trial would affect various aspects of the veniremember's deliberations such as the veniremember's "ability to be fair." The record further reflects that, at the beginning of voir dire, respondent carefully explained to the veniremembers that the trial proceedings would be videotaped for broadcast after trial for educational purposes and asked the veniremembers whether this would affect their deliberations. Respondent also informed the veniremembers that he had never heard of this happening before and that he believed that the videotaped proceedings would be "edited, cut down to some kind of an hour, two hours."

[RESPONDENT]: The second questionnaire that you filled out has to do with television or videoing of this particular trial. In this particular case, I suspect that the entire trial may be videoed for showing on public television after the trial is completely over with down the road. That is a possibility. And that includes every aspect of the trial including jury selection all the way through jury deliberations and every aspect of the trial in between.

Several of you stated in your questionnaire that you did not want to be videoed. That's great. That's why we asked the question. And I want to explain that a little further and see if there's any further responses. Because that's the first order of business and

---

2. Relator asserts that Mr. Harrison has not waived "his right to complain in post-conviction proceedings that the recording of the deliberations deprived him of a fair trial, or

that his court-appointed attorneys provided ineffective assistance of counsel by consenting to the recording of the deliberations."

after we have cleared that up, we will start the jury selection in this case. As I mentioned, this case will be videoed for public television at some later date from jury selection to trial, all aspects of the trial including jury deliberations. It will not be live. It will not be aired live. In other words, this isn't live TV. It's videoed. Will be edited, cut down to some kind of an hour, two hours. I'm not sure.

Everything that takes place in a jury room is secret in the sense that no one will know what takes place back there except it would be recorded. That is the possibility in this case, it would be recorded.

Now, other than the ones that have already answered that question on the questionnaire, let me ask the rest of you. Is there anyone in this audience who feels that having the trial videoed for a later showing, including jury deliberations, in any way would affect your decision in this case? I don't how it would affect you [sic]. But would it affect you in any way at all? Could you be just as candid and forthright as a juror in this case with a camera and without a camera? That's really the question. So, other than the ones that have already answered that question, are there any others who feel that the videoing of this trial for showing on TV public television at a later time would affect you in any way during the trial, keep you from being fair, keep you from being objective, keep you from saying something, any of those things?

Anybody else?

If you do, raise your hands.

You'll get this question again before each one of you that are on the jury are sworn in, I'm going to ask you this question one more time. Because it's important. I'll level with you. As far as

I know, this has never been done in a court of law, ever, in any courtroom anywhere. And the defense in this case is agreeing to this. They don't object, just so you know. And that is why it will be taking place in this case. But it's the first time. Never heard of it happening and you probably never will[.]

[VENIRE PERSON]: What is the purpose of videoing this?

[RESPONDENT]: To educate the public on administration of justice in our courtroom. So the public has a better understanding of the real world and what takes place in our courts. This is a conception among everybody about courtrooms, especially criminal cases. And my own opinion is the more the public can know about the truth, the way things really are, the better we are as a people. And the system benefits from this, this system we all operate under. So, that's why it's public television.

[RESPONDENT]: Yes?

[VENIRE PERSON]: When you say through jury deliberations, that means going into the jury room where all the jurors are discussing the matter and trying to come up with a verdict?

[RESPONDENT]: That is correct. There won't be a person back there, but there's a camera back there. And it will record what takes place. It's not live. None of these people would ever see it until after the trial is over. It's secured by the Court. The viewing in the jury room, how the mechanics and dynamics of the discussion in the jury room, all of that would be recorded, televised to be shown at a later date.

So, anybody else, other than those people that filled out the form that would give them a concern? Are there any other people? Okay.

The record reflects that 13 venire-members were "excused by agreement"

because "they had a problem about having the case videoed."

> [RESPONDENT]: ... Just so the record is perfectly clear, the lawyers and the Court with the Court's agreement: Any juror that had a problem in any way of answering the Question 118 will be excused if they had a problem about having the case videoed; is that correct?
>
> [MR. HARRISON]: That is correct, Your Honor.
>
> [RESPONDENT]: Is that right?
>
> [RELATOR]: Yes, Judge.
>
> [RESPONDENT]: And then there were 13 of those jurors. Do you have those marked?
>
> [THE CLERK]: Yes, sir.
>
> [RESPONDENT]: Okay. Read into the record those 13 jurors. These are the people that have already been excused by agreement based on Question 118.

The next day two more veniremembers were "excused by agreement" for similar reasons. That same day relator filed this original mandamus proceeding in this Court seeking to bar only the videotaping of the jury deliberations. Relator asserts that, when he filed this mandamus proceeding, "a panel of prospective jurors [had] completed preliminary questioning and was directed to return to relator's court for individual voir dire examination" at a later date. This Court stayed the proceedings in respondent's court before individual voir dire examination began. This Court later granted relator's motion for leave to file with the stay remaining in effect "pending further orders by this Court."

## A. General Mandamus Principles

■■■ This Court will grant mandamus relief if relator can demonstrate that the act sought to be compelled is purely "ministerial" and that relator has no other adequate legal remedy. *See Hill v. Fifth Court of Appeals*, 34 S.W.3d 924, 927–28 (Tex.Cr.App.2001). We have described the "ministerial act" requirement as a requirement that the relator have "a clear right to the relief sought" meaning that the relief sought must be "clear and indisputable" such that its merits are "beyond dispute" with "nothing left to the exercise of discretion or judgment." *See id.* Mandamus does not lie to correct a trial court's ruling on an "unsettled or uncertain" question of law. *See id.*[3]

---

3. In *Hill*, we noted a possible conflict between our decisions in *State ex rel. Curry v. Gray*, 726 S.W.2d 125 (Tex.Cr.App.1987), and *Healey v. McMeans*, 884 S.W.2d 772 (Tex.Cr. App.1994). *See Hill*, 34 S.W.3d at 927 n. 3 and at 928 n. 5. *Healey* explained that an act is ministerial when the "law clearly spells out the duty to be performed with such certainty that nothing is left to the [sic] discretion or judgment" and that mandamus may be used to correct judicial action "that is clearly contrary to well-settled law, whether that law is derived from statute, rule, or opinion of a court" such as "clear, binding precedent from a court of superior jurisdiction." *See Healey*, 884 S.W.2d at 774. *Hill* noted that this potentially conflicted with our statement in *Gray* that mandamus does not lie to compel a trial court "to rule a certain way." *See Gray*, 726 S.W.2d at 128.

This statement from *Gray*, however, must be read in the context of the issue presented in *Gray*. The act sought to be compelled in *Gray* was to require the trial court to rule a certain way on an issue involving the doctrine of collateral estoppel "as embodied in the Fifth Amendment guarantee against double jeopardy" under *Ashe v. Swenson* the application of which is inherently discretionary and almost always "uncertain and unsettled." *Gray*, 726 S.W.2d at 126; *see Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 1194–95, 25 L.Ed.2d 469 (1970) (requiring courts to "examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude [sic] whether a rational jury could have grounded its [general] verdict upon an issue other than that which the defendant seeks to foreclose from consideration") and at 1203–

Relying on *Hill,* respondent argues that videotaping the jury deliberations is a matter of judicial discretion because this involves an issue of first impression. In *Hill,* the trial court followed the "plain" language of a statute which the relator sought to have declared unconstitutional. *See Hill,* 34 S.W.3d at 926. We held that the relator failed to establish a "clear legal right" to have the statute declared unconstitutional in part because the constitutional issue was one of first impression but also (and more importantly) because we could not hold that "the trial court would be conducting a ministerial act by refusing to apply the plain language" of the statute that relator sought to have declared unconstitutional. *See Hill,* 34 S.W.3d at

928. *Hill* does not stand for the proposition that, when the issue involved in a mandamus proceeding is one of first impression, this is necessarily dispositive of the ministerial act requirement.

### B. Ministerial Act

When subject-matter jurisdiction is properly invoked, a trial court's inherent power includes broad discretion over the conduct of its proceedings.[4] Though some limits to this broad discretion may exist,[5] this Court would find it very difficult to decide that respondent has no discretion to permit the videotaping of jury deliberations (even for live broadcast) in the absence of a statute that specifically prohibits it. *Cf. Patrick,* 86 S.W.3d at 595 (discussing the maxim that "whatever is not forbidden is permitted").[6]

05 (Burger, C.J., dissenting) (collateral estoppel concept "is a strange mutant as it is transformed to control" in criminal cases); *Reynolds v. State,* 4 S.W.3d 13, 21 n. 18 (Tex.Cr.App.1999) (acknowledging the ambiguity in this Court's "collateral estoppel" jurisprudence) and at 22 (Meyers, J., dissenting) (same). The real problem in *Gray,* therefore, was not necessarily that the relator was attempting to have this Court compel the trial court "to rule a certain way" but that the relator was attempting to have this Court compel the trial court "to rule a certain way" on an uncertain and unsettled issue the resolution of which involved a fair amount of discretion.

We reconcile *Gray* and *Healey* on this basis: when read together with *Hill,* these cases support the proposition that mandamus may lie to compel a trial court "to rule a certain way" on an issue that is "clear and undisputable" such that its merits are "beyond dispute" or when the "law clearly spells out the duty to be performed with such certainty that nothing is left to the [sic] discretion or judgment" whether that law is derived from "statute, rule, or opinion of a [superior] court." *See Hill,* 34 S.W.3d at 928 n. 5. Of course, mandamus will not lie even under these circumstances if the aggrieved party has a right to appeal since the right to appeal is usually considered an adequate legal remedy. *See Gray,* 726 S.W.2d at 127.

4. *See* Article 5, Section 8, Texas Constitution, (setting out broad grant of jurisdiction to district courts); *State v. Patrick,* 86 S.W.3d 592, 595–96 (Tex.Cr.App.2002); *State v. Johnson,* 821 S.W.2d 609, 612 (Tex.Cr.App.1991); *Awadelkariem v. State,* 974 S.W.2d 721, 728 (Tex.Cr.App.1998) (Meyers, J., concurring); *Ex parte Krupps,* 712 S.W.2d 144, 153 (Tex. Cr.App.1986) (Onion, P.J., concurring) ("judge's control of the courtroom must be maintained with as little burden on him as possible") and at 160 (Campbell, J., dissenting) (same) and at 163 (Miller, J., dissenting) (same)

5. Relator asserts that mandamus would lie if, for example, a district court required jurors "to disguise themselves with ski masks and speak only Pig Latin during deliberations." That may be so. But, this case does not present such extreme circumstances.

6. In *Patrick,* we decided that mandamus relief was warranted because the district court acted without subject-matter jurisdiction and, therefore, had no power to act. *See Patrick,* 86 S.W.3d at 595. This case does not present the jurisdictional issue presented in *Patrick* as there is no dispute that respondent has jurisdiction over the subject-matter in this case.

■ Relator argues that respondent has no discretion to permit videotaping of the jury deliberations because the first sentence of Article 36.22, Texas Code of Criminal Procedure, clearly prohibits it. The first sentence of Article 36.22 provides that "[n]o person shall be permitted to be with a jury while it is deliberating."[7] Relator claims that videotaping the jury's deliberations will unlawfully pierce the "veil of confidentiality" of jury deliberations established by the first sentence of Article 36.22. Relator further claims that maintaining the confidentiality of jury "deliberations is essential to preservation of the jurors' ability to fully and freely consider all aspects of the case, without fear of embarrassment, retaliation, or public approbation."

Respondent claims that it is within his sound discretion to permit videotaping of the jury deliberations because no "statute, rule, or common law in Texas" clearly prohibits an unattended camera to videotape the jury deliberations for later public broadcast. Respondent argues that videotaping jury deliberations does not violate the "plain" language of Article 36.22 because Article 36.22 does not establish an absolute "veil of confidentiality" of jury deliberations but only prohibits persons from being present with the jury during deliberations for the purpose of preventing jurors from being subjected to outside influences and pressures. Respondent further asserts that if Article 36.22 did "create a veil of confidentiality, then jurors would not be free to violate this statute by speaking about deliberations after a verdict is rendered, a very common practice in Texas." Respondent also asserts that if "current law did forbid taped jury deliber-

ations, there would be no reason for proposing Senate Bill No. 164 [which apparently has been filed and is pending in the current legislative session] to bar the recording of jury deliberations in trials commenced on or after September 1, 2003."

Respondent argues in his brief:

Relator reads into this unambiguous provision [of Article 36.22] a requirement that deliberations be conducted under a "veil of confidentiality," such that jurors be "unobserved and unheard by others during deliberations." (Relator's Brief at p. 4 & 6). That is not what the provision requires; rather, it merely prohibits any "person" from being present, i.e. "with", a jury during deliberations. By preventing the presence of other persons during deliberations, Article 36.22 achieves the goal of preventing jurors from being subjected to *outside influences and pressures*. This purpose is clearly evidenced by the title of the provision: "Conversing with the jury." In this case, recording jury deliberations cannot possibly introduce outside influences and pressures on the jury—there would be no "person" present "conversing with the jury." Instead, there would merely be the presence of an unattended, remote-controlled video camera in the jury room. The camera is not a person, nor is it capable of interacting or conversing with jurors about any subject, much less about the case on trial.

■ This case boils down to what the Legislature meant in the first sentence of Article 36.22 by its language, "[n]o person shall be permitted to be with a jury while it is deliberating." We normally construe a statute according to its "plain" textual meaning without resort to extratextual

---

7. Article 36.22, whose caption is "Conversing with Jury," in its entirety provides:

No person shall be permitted to be with a jury while it is deliberating. No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court.

sources. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Cr.App.1991). We will, however, also resort to extratextual sources to construe a statute if we decide that the statute is ambiguous or that construing the statute according to its "plain" textual meaning will lead to "absurd consequences." *See Jordan v. State*, 36 S.W.3d 871, 873 (Tex.Cr.App.2001). Mandamus may lie to compel compliance with even an ambiguous statute if we can determine the "clear and indisputable" meaning of the statute by resort to extratextual sources. *See Hill*, 34 S.W.3d at 927–28.

Respondent claims that videotaping the jury deliberations does not violate the first sentence of Article 36.22 because the unattended camera is not a "person with [the] jury" and "cannot possibly introduce outside influences and pressures on the jury" while it is deliberating. But each of the millions of viewers of the videotape is a person, and the playing of the videotape (live or not) permits these persons to "be with the jury while it is deliberating" under the "plain" language of the fist sentence of Article 36.22.

And, videotaping the jury deliberations with an unattended camera does introduce an "outside influence and pressure" on the jury while it is deliberating. Questioning the veniremembers during voir dire about whether this will affect their deliberations all but admits that this is an "outside influence and pressure" since these are normally the types of questions asked after an improper outside influence has been brought to bear on a jury for which our law presumes prejudice.[8] In addition, it normally cannot be determined whether an event introducing an "outside influence and pressure" on the jury has affected jury deliberations until **after** (not before) the event has occurred.[9] Even though many of the veniremembers in this case may have indicated that videotaping their deliberations will not affect them, this really cannot be determined until after the jury has completed its deliberations.

In a notorious Texas case involving televising portions of a defendant's trial which did not include televising the jury deliberations,[10] Justice Clark's observations about the "potential impact of television on jurors" are also responsive to the argument that an unattended camera videotaping jury deliberations is not an "outside influence and pressure."

> As has been said, the chief function of our judicial machinery is to ascertain the truth. The use of television, however, cannot be said to contribute materially to this objective. Rather its use amounts to the injection of an irrelevant factor into court proceedings. In addition experience teaches that there are numerous situations in which it might cause actual unfairness—some so subtle as to defy detection by the accused or

---

**8.** *See Romo v. State*, 631 S.W.2d 504, 506 (Tex.Cr.App.1982), *overruled on other grounds*, *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Cr.App.1996), cert. denied, 520 U.S. 1173, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997) (juror testified that officer's unauthorized communication did not affect her ability to decide the case).

**9.** For example, in the *Romo v. State* situation, the veniremembers would not be asked at voir dire whether some later "outside influence or pressure" (such as the one that occurred in

*Romo*) would affect their deliberations. *See Romo*, 631 S.W.2d at 506.

**10.** *See Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 1629, 14 L.Ed.2d 543 (1965) (televising and broadcasting of defendant's trial deprived defendant of a fair trial under the Fourteenth Amendment); *see also Chandler v. Florida*, 449 U.S. 560, 101 S.Ct. 802, 809, 66 L.Ed.2d 740 (1981) (*Estes* did not announce a rule that broadcast coverage of criminal trials is *per se* a denial of due process).

control by the judge. We enumerate some in summary:

1. The potential impact of television on the jurors is perhaps of the greatest significance. They are the nerve center of the fact-finding process. It is true that in States like Texas where they are required to be sequestered in trials of this nature the jurors will probably not see any of the proceedings as televised from the courtroom. But the inquiry cannot end there. From the moment the trial judge announces that a case will be televised it becomes a cause celebre.... If the community be hostile to an accused a televised juror, realizing that he must return to neighbors who saw the trial themselves, may well be led "not to hold the balance nice, clear and true between the State and the accused...."

Moreover, while it is practically impossible to assess the effect of television on jury attentiveness, those of us who know juries realize the problem of jury "distraction." The State argues this is de minimis since the physical disturbances have been eliminated. But we know that distractions are not caused solely by the physical presence of the camera and its telltale red lights. **It is the awareness of the fact of telecasting that is felt by the juror throughout the trial. We are all self-conscious and uneasy when being televised. Human nature being what it is, not only will a juror's eyes be fixed on the camera, but also his mind will be pre-occupied with the telecasting rather than with the testimony.**

*Estes*, 85 S.Ct. at 1634 (emphasis supplied).

■ We hold that the first sentence of Article 36.22 clearly and indisputably prohibits the videotaping of jury deliberations.[11] The existence of a proposed and pending Senate Bill that more clearly prohibits what the first sentence of Article 36.22 already clearly prohibits is of no consequence. We further note that our interpretation of the first sentence of Article 36.22 is also consistent with the ancient and centuries-old rule that jury deliberations should be private and confidential in order to promote "freedom of debate," "independence of thought" and "frankness and freedom of discussion and conference." *See Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915);[12] *see also Alsup v.*

11. Our interpretation of the first sentence of Article 36.22 also does not prevent a juror from speaking about the deliberations after a verdict is rendered since the second sentence of Article 36.22 prohibits this while the case is "on trial."

12. These cases apply the general rule that a juror cannot impeach his own verdict. This rule is codified in Texas Rule of Evidence 606(b) which, like the first sentence of Article 36.22, promotes, among other things, the confidentiality of jury deliberations. The Supreme Court's decision in *McDonald v. Pless* explains that this rule is a choice between the lesser of two evils. *See McDonald*, 35 S.Ct. at 784–85:

The rule [that a juror cannot impeach his own verdict] is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what had happened in the jury room. These two conflicting considerations are illustrated in the present case. If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict. But let it once be estab-

*State*, 118 Tex.Crim. 388, 39 S.W.2d 902, 903 (1931) (requiring jurors to identify publicly in the presence of spectators those jurors who disagreed with the majority was error because the "deliberations of a jury are required to be kept secret"); Abraham Abramovsky & Jonathan L. Edelstein, *Cameras in the Jury Room: An Unnecessary and Dangerous Precedent*, 28 Ariz.St.L.J. 865 (1996); Cohn Marjorie & David Dow, *Cameras in the Courtroom: Television and the Pursuit of Justice* 154, McFarland & Company, Inc. (2d ed.1998); Lloyd E. Moore, *The Jury: Tools of Kings, Palladium of Liberty* 2, Anderson Publishing (2d ed.1973).

Finally, respondent points to instances where other jurisdictions (Arizona and Wisconsin) have permitted videotaping of jury deliberations and claims that this had "no impact on jury deliberations." Relator speculates that videotaping the jury deliberations in the Arizona experiment affected the jury deliberations since two out of the three cases chosen for initial broadcast resulted in hung juries and mistrials. The practice of other jurisdictions, however, does not control our interpretation of Article 36.22.

## C. Adequate Legal Remedy

Relator has no right to appeal respondent's order. We have decided that this satisfies the no adequate legal remedy mandamus requirement. *See Patrick*, 86

S.W.3d at 594; *Gray*, 726 S.W.2d at 127–28.

As is our custom, we withhold issuance of the writ to accord respondent an opportunity to make that unnecessary. *See Hill*, 34 S.W.3d at 929. We also lift the stay of proceedings in respondent's court.

PRICE, JOHNSON, and COCHRAN, JJ., filed concurring opinions.

KELLER, P.J., and KEASLER, J., filed dissenting opinions.

MEYERS, J., dissents.

PRICE, J., filed this concurring opinion.

I join the majority opinion and agree that conditionally issuing a writ of mandamus is appropriate in this case. I write separately to express some additional reasons for my conclusion.

As the amici and Judge Keasler point out, there is a "cardinal principle that the deliberations of the jury shall remain private and secret in every case." *United States v. Virginia Erection Co.*, 335 F.2d 868, 872 (4th Cir.1964). Judge Keasler also points out that this Court has recognized that "[t]he deliberations of a jury are required to be kept secret." *Alsup v. State*, 118 Tex.Crim. 388, 390, 39 S.W.2d 902, 903 (1931). To this end, the citizens of the State of Texas, through the legislature, enacted the predecessor to Code of Criminal Procedure Article 36.22.[1]

lished that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. **If evidence thus secured could be thus used, the result would be to**

**make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.**

(Emphasis Supplied).

1. The Article reads in full:

No person shall be permitted to be with a jury while it is deliberating. No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court.

But the policy that supports the law is not the point. Mandamus is an extraordinary remedy, only issuing when there is a clear right to the relief sought and when there is no other adequate remedy. *State ex rel. Hill v. Court of Appeals for the Fifth District*, 34 S.W.3d 924, 926 (Tex. Crim.App.2001). In this case, Code of Criminal Procedure Article 36.22 clearly provides a right to the relief sought, and the State has no adequate remedy other than mandamus.`

There are two parts to Article 36.22. The first, that no person shall be permitted to be with a jury while it is deliberating. The second, that no person shall be permitted to converse with jurors except under limited circumstances. If the Article had included only the second part, I might agree with the dissenters. A camera or even a person could be present in the jury room during deliberations, but the person could not converse with the jurors.

But Article 36.22 is designed to protect jury deliberations from something more than someone conversing with jurors. The very presence of another person who is not under the same oath as the jurors affects deliberations. The camera brings the viewers to the jury just as surely as it brings the jury to the viewers. For what other purpose could the first sentence in the Article have been enacted?

Some judges believe that the statute is not sufficiently clear enough to conclude that the trial judge exceeded the scope of his discretion. If we were to conclude that Article 36.22 did not apply in this case, there are many equally disturbing scenarios that would be within a trial court's discretion.

For example, what if a person had a water glass against the wall of the jury room and was listening? He is a person, but is he *with* the jury? What if the door to the room was ajar and a woman was standing around the corner listening? Is she *with* the jury? What if there were a window in the room and a lip-reader with a telescope were to interpret what jurors were saying from the top of a building across the street? Is she *with* the jury? These situations would be no different than the case before us, especially if the people who observed the jury did not tell what they learned until after a verdict was rendered.

What if Co–Production wanted to broadcast the proceedings live? An interpretation of the Article that allows deliberations to be taped and later broadcast allows the same proceedings to be taped and broadcast live. If the statute is read as the dissenters would have us read it, a camera is not a "person" and the people viewing the broadcast are not "with" the jury. Judge Keasler's dissent focuses on the language "while the jury is deliberating," but a party could rely on the terms "person" and "with" in the same manner.

If the trial judge is within his discretion in allowing the video camera into the jury room, then how can his decision be shocking and appalling? No one has accused the trial judge of having an impure motive. His intention is clear. "It is important in my opinion, that our country, our community, knows what takes place in these courtrooms. And the better educated folks can be, the better they'll have an appreciation and understanding of the greatest judicial system ever invented." A trial judge who acts within his discretion with pure motive should not be said to have made an order that is shocking and appalling.

The problem in this case is that the trial judge, however well intentioned, exceeded

Tex.Code Crim. Proc. art. 36.22.

the scope of his discretion because Article 36.22 prohibits permitting a person to be with the jury while it deliberates. Permitting the recording and broadcast, whether live or after the verdict has been rendered, has the same effect. And it was that effect that Article 36.22 was designed to prohibit. Foreknowledge that one's secret deliberations will not be kept secret cannot help but change the form and content of the deliberations and, perhaps, the result.[2] A line was crossed that Article 36.22, by its clear language, does not permit.

The argument can be made that the presence of a video camera is not the same as the presence of a person. But that argument is not very persuasive. The reason the hypotheticals given above and the actual scenario with which we are faced in this case are prohibited under Article 36.22 is that to be with the jury is to perceive with one's senses what is happening in the jury room. It nullifies the privacy that Article 36.22 was designed to protect.

That the legislature is currently addressing the issue is of no moment. The legislature enacts legislation. If this or some other court misinterprets the language of a statute, the legislature does not issue a statement correcting us. The legislature amends the statute to make things more clear. Regardless, the current and future acts of the legislature are not appropriate to consider. Our task today is to consider the law as written, and our decision can be no different whether the legislature chooses to enact a change or not.

Lady Justice is blindfolded, but the majority sees clearly that Article 36.22 prohibits the trial court's action in this case. It is appropriate for this Court to conditionally grant the relator's application for writ of mandamus.

With these comments, I join the majority opinion.

JOHNSON, J., filed a concurring opinion.

As other judges of this Court point out in their opinions, mandamus will not lie if the law is unsettled or uncertain. It is this concept that has led to the statement that mandamus will not lie in a case of first impression. However, some concepts are so settled and certain that, if challenged, the case is one of first impression only because the concept is so settled that no one has thought it reasonable to challenge it. I would argue that the sanctity of the jury room is one of those concepts.

As other judges of this Court point out in their opinions, at least as far back as *Alsup v. State,* 118 Tex.Crim. 388 39 S.W.2d 902, 903(1931), this Court has held that jury deliberations are required to be kept secret. The statute that produced that holding has not changed significantly in the last seventy years.[1]

The most important word for the purposes of this discussion is "kept." To keep is to maintain in a specified condition over time, in this instance, to maintain secrecy. WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 781 (1989). When we speak of keeping a secret, it is assumed that the

---

**2.** It is interesting to note Judge Poe's comment to the venire on secrecy:

"Everything that takes place in a jury room is secret in the sense that no one will know what takes place back there *except it would be recorded.*" (emphasis added).

**1.** From 1925 until 1965, article 36.22 read:

No person shall be permitted to be with a jury while they are deliberating upon a case, nor be permitted to converse with a juror after he has been impaneled, except in the presence and by the permission of the court, or except in a case of misdemeanor where the jury have been permitted by the court to separate. No person shall be permitted to converse with the juror about the case on trial.

matter will remain secret until the promiser is released by the promisee. The promise may be undone by the promisee giving the promiser permission to speak or by the promisee choosing to reveal the matter. It is not keeping a secret to wait only until the promisee has left the room before revealing the secret.

Our law gives to the jurors, as promisees, the power to reveal matters that are otherwise to be kept secret. After the conclusion of a trial, jurors may speak about their deliberations or choose to keep them secret. If the jurors speak, they may reveal all or only some of the discussions and positions taken and abandoned. That power to choose is meaningless if the choice is made by a judge, camera crew, or production company. To permit someone other than the jurors to choose to reveal all or part of the deliberations is to break a promise made to them by society—that their deliberations would be kept secret. The promise is no less a promise just because the jurors have left the room.

I concur in the judgment of the Court.

COCHRAN, J., filed a concurring opinion.

I join the majority opinion. I write separately to provide additional explanation for my decision.

I.

First, what, precisely, is the procedure at issue here? Judge Poe has granted Mead Street Films (*"Frontline"*) the exclusive rights to videotape (including audio) the jury deliberations in this capital murder trial. According to *Frontline's* Request for Permission to Record and Broadcast Proceedings in this case:

> The Co–Production will record proceedings in the courtroom using traditional camera equipment and sound recording equipment including stationary and wireless microphones standard in broadcast television. Care will be taken to ensure that all courtroom filming is unobtrusive. Jury deliberations will be recorded using **remote operated cameras** and sound recording equipment to minimize distractions to the jurors. The placement and number of all cameras and microphones will be determined in consultation with the court. (emphasis added) [1]

*Frontline* requested, and was granted, the exclusive right to later broadcast this footage, as well as exclusive access to the video and audio material. *Frontline* also apparently has the right to exercise sole control over the editing process and will turn the entire capital murder trial proceedings into a "documentary special [which] will be two to three hours in length to give sufficient time and space to bring depth and understanding to this complex and challenging topic."

Included in the exhibits submitted to this Court by Judge Poe ("Respondent") and *Frontline* is a copy of PBS's prior televised program, entitled "Inside the Jury Room," which includes video and audio footage of jury deliberations from a 1986 Milwaukee criminal trial. I have viewed that videotape. It is instructive.[2]

---

1. *Frontline* repeats, in its brief to this Court that: "the filming of jury deliberations will take place by unobtrusively placed, remotely operated cameras." Brief of Real Parties in Interest Mead Street Films, Inc. And WGBH Educational Foundation p. 5.

2. George V. Higgins, a Stanford M.A., lawyer, mystery writer, and television commentator, wrote that the 1986 PBS documentary of these jury deliberations exemplified the "Hawthorne Effect." Higgins, *Television: Truth, but Not the Whole Truth*, Wall St. J., Apr. 14, 1986, at 26. According to Higgins, the "Hawthorne Effect" occurs when "people

It is apparent that several different, remote-controlled cameras were used and the cameraman outside the courtroom focused one of those cameras for close-up shots of the particular juror speaking, moved the camera for close-ups of the next speaker, and then jumped from juror to juror as conversations developed across the room.[3] The cameraman, though literally outside the jury room, was contemporaneously aware of every word spoken, every gesture made, and every person speaking as he simultaneously recorded it. Thus, the eyes and ears of one person are in the jury room during the jury deliberations and, under *Frontline's* proposal, millions of eyes and ears will be in the jury room in the months and years after those deliberations.[4]

---

who are aware that they are being observed alter their behavior (in this case, adopting vast eloquence and extreme circumspection) to meet what they imagine to be the expectations of the observers." *Id.* The "Hawthorne Effect" has also been explained as:

> Initial improvement in a process of production caused by the obtrusive observation of that process. The effect was first noticed in the Hawthorne plant of Western Electric. Production increased not as a consequence of actual changes in working conditions introduced by the plant's management but because management demonstrated interest in such improvements.

Principia Cybernetica Web at http://pespmc1.vub.ac.be/ASC/HAWTHO.EF-FEC.html.

In their statement of nonconcurrence to a CBS project to videotape jury deliberations in a civil trial, two Maine Supreme Court justices noted the same problem:

> To film a trial and the jury deliberations that follow when all of the participants, judge, litigants, lawyers, and jurors have consented to the process cannot replicate a trial without the electronic intrusions. Selection of only those jurors who do not mind thinking out loud before millions of observers, or those who will serve but in silence, by its nature will distort the jury's deliberative process. In such circumstances, the presence of the cameras that seek to record how a jury reaches its decision will distort the very deliberative process the cameras purport to record. By the process of measurement the object of measurement will be changed and any conclusions reached on the basis of such measurement made indefensible. What is represented to be the jury process will not be the jury process.

Administrative Order, Docket No. SJC–228, 1996 Me. LEXIS 32 (Feb. 5, 1996) (Glassman & Rudman, JJ., statement in nonconcurrence).

In this case, for example, at least thirteen prospective jurors were peremptorily excused because they admitted that videotaping and later broadcasting the jury deliberations might affect their ability to decide the case fairly. These jurors were eliminated for reasons wholly unconnected to their ability to follow the law or to fairly consider the evidence.

3. In the CBS Protocol submitted to the Maine Supreme Court when it sought permission to film jury deliberations in that state, CBS set out its procedure for jury room videotaping:

> There would be two hidden remote-controlled cameras in the jury room, so as to avoid photographers standing in the room. We prefer to use the standard-size cameras as opposed to the cigar-size because of superior maneuverability and picture quality. These cameras would feed pictures to a separate room, so that their presence would be virtually undetectable.
> 1. It will probably be necessary to construct a "blind" for the remote-controlled cameras in the jury room—e.g., a one-way mirror or a cabinet....
> 2. Inside the jury room, we would place small microphones strategically so as to cover the sounds in the room, but we would not be asking any juror to wear a wireless microphone.

Administrative Order, Docket No. SJC–228, 1996 Me. LEXIS 32 (Feb. 5, 1996). *Frontline's* production protocol has not been submitted as an exhibit to this court, but presumably it is at least similar to that of CBS.

4. Respondent, Judge Poe, notes that the jury deliberations will not be televised "live." Rather, the videotapes would be sealed and held by the court until the jury's verdict and any post-trial motions are complete.

*Frontline* uses its prior program (as well as equivalent experiments in several other jurisdictions) as precedent for its present position that videotaping jury deliberations is permissible. Were it not, the argument goes, surely these other courts would not have allowed it.[5] This argument carries no weight, however, because on those prior occasions, all of the parties *consented* to the filming. Because no party objected, the issue was never contested on appeal. I am unable to find any reference anywhere to any case in any jurisdiction in which a trial judge allowed a television crew to film jury deliberations when one of the parties *objected* to that process. In this case, the District Attorney of Harris County has vehemently objected to this project. He is joined by amicus briefs from the Texas District and County Attorneys' Association, the El Paso District Attorney, and the Bexar County District Attorney. In this case, we are concerned only with the filming of jury deliberations when one of the parties to the litigation objects to the procedure.

## II.

Second, does Judge Poe's order violate a Texas law? Yes, it violates a specific statute as well as centuries of common law as developed, interpreted, and applied in American courts.

Article 36.22 of the Code of Criminal Procedure reads:

> No person shall be permitted to be with a jury while it is deliberating. No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court.

While he is recording the jury deliberations, the *Frontline* cameraman would be "with" the jurors. Thus, Judge Poe's order, granting *Frontline* the right to videotape the jury deliberations, violates article 36.22. The cameraman outside the jury room filming the deliberations occurring inside the room is exactly like a silent reporter sitting behind a screen inside that room. One is literally inside the room, while the other is figuratively inside the room. Both are privy to every word of every juror. But the cameraman also sees and records every gesture and act as well.

A camera that is in the jury room with a person at the other end of it is the equivalent of that person being in the room. The camera simply extends the viewer's physical senses of sight and hearing, just as a periscope allows the submarine command-

---

**5.** Respondent notes that in both Arizona and Colorado, where CBS and ABC sought to film, "the highest court of each state had given permission to the media to tape jury deliberations." That has not occurred in Texas.

Prior to CBS's unsuccessful attempts to film jury deliberations in a Maine civil proceeding, the trial court asked for guidance from that state's Supreme Court, which then issued an order permitting such videotaping under a specified protocol, including the consent of *all* parties as well as that of the individual jurors. Two of the seven justices filed a statement in nonconcurrence, stating, *inter alia*, that:

> It is suggested that the proposed television documentary in invading the confidentiality of jury deliberations is to inform the public of the jury process. The purpose of the judicial system in protecting the confidentiality of jury deliberations is a centuries-old recognition that justice is best served by the fostering of a free, open and candid debate in reaching a decision. Such free debate can only occur when the jurors are assured of a complete confidentiality. The need for the public to know does not encompass the furnishing of a workshop to the public for sociological, psychological or psychiatric evaluation of the jurors or of the deliberative process.

Administrative Order, Docket No. SJC–228, 1996 Me. LEXIS 32 (Feb. 5, 1996) (Glassman & Rudman, JJ, statement of nonconcurrence).

er who is literally 20 feet under the water to visually inspect the ocean surface above him. Twenty-first century technology enables viewers to be figuratively present on the moon, in space capsules, exploring the sunken Titanic, and in other people's bedrooms.

Respondent argues that the statute does not really mean what it says, but rather that the statute only forbids outsiders from communicating with jurors in an attempt to influence them. He states in his post-submission brief:

It must be remembered that Article 36.22 is intended to prevent outside influences from affecting deliberations, and, ultimately, the verdict. Thus, so long as outside influences are eliminated, and other applicable laws are followed, jury deliberations could be conducted in an open courtroom, a jury room without a door, a restaurant, or any other location without presenting an issue ripe for mandamus.

Under this theory, counties could install large one-way mirrors, as is done in police interrogation rooms, so that the parties, attorneys, judges, and the general public might peer in on the jury as it deliberates in its jury room. As long as the viewers do not knock on the glass or talk to the jurors, all is well. But if jury deliberations are open to the public, then *Frontline* cannot have exclusive access to this jury deliberation room. It has the same right of access as does the public, no more and no less.[6]

The cameraman and these other viewers are not "with" the jurors in *every* sense of the word, just as millions of television viewers were not literally "on the moon" with Neil Armstrong. Thus, the majority correctly examines the history and purpose of article 36.22 to determine if there is any justification for Relator's position that the cameraman (and ultimately millions of television viewers) is not "with" the jury during its deliberations if his eyes and ears are present, but his mouth is not.

At oral argument, Respondent's counsel agreed, when asked whether jury deliberations are "secret" or "public," that they are secret. He is correct. Indeed, innumerable American and English judges, academics, and writers have extolled the mystical functioning of secret jury deliberations.[7]

---

**6.** *See, e.g., Saxbe v. Washington,* 417 U.S. 843, 849–50, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974) (prison regulation limiting press access to prisoners did "not place the press in any less advantageous position than the public generally"); *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) ("newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public"); *United States v. Harrelson,* 713 F.2d 1114, 1116–18 (5th Cir.1983) (noting that even after trial, jurors "are entitled to privacy and to protection against harassment" and stating that "the First Amendment right to gather news is neither absolute nor does it provide journalists with special privileges denied other citizens" such as the "particulars of jury deliberation").

**7.** Under our Anglo–American system, we take twelve ordinary people, put them in a jury room, close the door, and—according to one's beliefs—either the Holy Ghost or Socratic wisdom descends upon them. When the door opens, the truth emerges. Thereafter, we do not allow the parties or the public to impeach that verdict with evidence of what occurred between the jurors in the sanctity of that jury deliberation room. *See United States v. Olano,* 507 U.S. 725, 737, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("the deliberations of the jury shall remain private and secret"); *Tanner v. United States,* 483 U.S. 107, 120–21, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) ("full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct"); *Clark v. United States,* 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993 (1933) ("freedom of debate might be stifled

Virtually without exception, American courts agree that:

the presence of [another person] in the jury room violate[s] the cardinal principle that the deliberations of the jury shall remain private and secret in every case. The presence of any person other than the jurors to which the case has been submitted for decision impinges upon that privacy and secrecy.[8]

As more strongly expressed:

no one should be with a jury while it is engaged in its deliberations. The jury

and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world"); *McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) (if evidence concerning jury deliberations and possible misconduct could be used to impeach a verdict, "the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference"); *United States v. Thomas*, 116 F.3d 606, 619 (2d Cir.1997) ("[t]he jury as we know it is *supposed* to reach its decisions in the mystery and security of secrecy; objections to the secrecy of jury deliberations are nothing less than objections to the jury system itself"); *United States v. Antar*, 38 F.3d 1348, 1367 (3d Cir.1994) (Rosenn, J., concurring) ("[w]e must bear in mind that the confidentiality of the thought processes of jurors, their privileged exchange of views, and the freedom to be candid in their deliberations are the soul of the jury system"); *In re Globe Newspaper Co.*, 920 F.2d 88, 94 (1st Cir.1990) ("a special historical and essential value applies to the secrecy of jury deliberations which is not applicable to other trial and pre-trial proceedings"); *United States v. Watson*, 669 F.2d 1374, 1391 (11th Cir.1982) ("[j]ury deliberations are kept private and secret to ensure that the verdict . . . is not affected by outside influences or matters extrinsic to evidence presented at trial"); *Babson v. United States*, 330 F.2d 662, 665–66 (9th Cir.1964) ("[a] juror must be insulated against influences and protected against pressures that would tend to fetter him in the free exercise of his own judgment. To this end the law requires that all deliberations by a jury must be conducted in the utmost privacy"); *People v. Bouton*, 50 N.Y.2d 130, 428 N.Y.S.2d 218, 405 N.E.2d 699, 703 (1980) ("[t]he strong public policy favoring the absolute confidentiality of jury deliberations is not lightly to be disregarded"); *People v. Oliver*, 196 Cal.App.3d 423, 241 Cal.Rptr. 804, 806 (1987) ("[e]qually implicit in this constitutional guaranty is the

right to have the jury's deliberations conducted privately and in secret, free from all outside intrusions, and extraneous influences or intimidations"); S.Rep. No. 93–1277, p. 13–14 (1974) (Senate Judiciary Committee Report to Fed.R.Evid. 606) ("common fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts. Jurors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation. In the interest of protecting the jury system and the citizens who make it work, rule 606 should not permit any inquiry into the internal deliberations of the jurors"); 1 William Holdsworth, A History of English Law 317 (7th ed.1956) (stating that any inquiry into the work of the jury would be as "impious" as questioning the judgments of God); Abraham Abramovsky & Jonathan I. Edelstein, *Cameras in the Jury Room: An Unnecessary and Dangerous Precedent*, 28 ARIZ. ST. L.J. 865, 885 (Fall 1996) ("[b]y centuries old tradition, jury deliberations in the American legal system are secret. This doctrine, which maintains that the confidentiality of jury deliberations insures impartiality and freedom from outside influence, has been acknowledged repeatedly by federal and state courts"); Abraham S. Goldstein, *Jury Secrecy and the Media: The Problem of Postverdict Interviews*, 1993 U. ILL. L.REV. 295, 295 ("[j]urors must deliberate in secret so that they may communicate freely with one another, secure in the knowledge that what they say will not be passed along to others"); Benjamin S. DuVal, Jr., *The Occasions of Secrecy*, 47 U. PITT. L.REV. 579, 646 (1986) ("[t]he secrecy of the jury@ room, like that of the Supreme Court conference, is designed to promote the free and candid interchange of views"); WILLIAM R. CORNICH, THE JURY 258 (1968) (stating that the inscrutability of the jury verdict, and the secrecy through which it is maintained, "is bound to last as long as the jury system itself. Once the inscrutability principle has gone, the time has come to set up another kind of tribunal").

**8.** *United States v. Virginia Erection Corp.,* 335

system is founded upon the proposition that interested jurors will hear the evidence in open court, and upon that evidence and that alone, deliberate among themselves until a verdict is reached. To permit various persons ... to be with the jury in its deliberations is to open the door to grave abuse and strike directly at the heart of the system.[9] The State of Texas, of course, agrees that "[t]he deliberations of a jury are required to be kept secret." [10]

Respondent argues that: 1)although jury deliberations are secret, article 36.22 does not explicitly prohibit filming and televising these secret deliberations; and that 2) there is only one purpose in keeping those deliberations secret—to prevent any outsiders from influencing the jurors. But because filming the deliberations is

not an outside influence, respondent argues, his order does not violate the statute.

Respondent, in his brief to this Court, argues that "there is no controlling authority that clearly prohibits the videotaping of jury deliberations." This is not surprising. When the forerunner to article 36.22 was enacted in 1925 and when the current article 36.22 was enacted in 1965, videotaping jury deliberations with remote controlled cameras and microphones was not technologically possible. The issue had simply never arisen before this case. Now that it has arisen, the Legislature is acting to make explicit what is implicit in the statute.[11]

Furthermore, statutory law is not the only type of law that governs criminal proceedings. As article 1.27 explicitly

---

F.2d 868, 872 (4th Cir.1964).

9. *Little v. United States,* 73 F.2d 861, 864 (10th Cir.1934); *see also Johnson v. Duckworth,* 650 F.2d 122, 125 (7th Cir.1981) (noting that "to stifle free debate in the jury room would hinder significantly the jury's ability to reach a 'common sense judgment," and that "if an intrusion into the jury's privacy has, or is likely to have, the effect of stifling such debate, the defendant's right to trial by jury may well have been violated").

10. *Alsup v. State,* 118 Tex.Crim. 388, 390, 39 S.W.2d 902, 903 (1931); *see also Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 367 (Tex.2000) (stating that "[t]o discharge their duties effectively, jurors must be able to discuss the evidence and issues without fear that their deliberations will later be held up to public scrutiny"); *Fernandez v. State,* 135 Tex. Crim. 12, 19–20, 116 S.W.2d 1067, 1071 (1938) ("it would be a dangerous and exceedingly pernicious practice for the courts to permit the sanctity of the jury room to be invaded, and the jurors to be interrogated as to the arguments used in their deliberations ... It would open the door to a searching inquiry in relation to every act and word which transpired in the jury room, and would subject each individual juror to be placed upon trial before the court to answer for the

soundness and propriety of the opinions expressed by him in the jury room")(quoting *Jack v. State,* 20 Tex.App. 656, 661 (Tex.Crim. App.1886)).

> Respondent argues that
> there is no required secrecy or confidentiality of deliberations for petit juries under [Rule 606] or any other rule, as there is for grand jury proceedings pursuant to article 20.02 of the Code of Criminal Procedure. The Texas Legislature certainly knows how to impose secrecy upon jury deliberations, and yet chose not to do so with respect to petit jurors.

It is possible, however, to argue the reverse. The secrecy of jury deliberations is *so* well established in American common-law jurisprudence that the Legislature never thought it necessary to state the obvious in a statute.

11. As Judge Keasler notes, at least two bills are currently pending in the Texas Legislature to explicitly prohibit the filming of jury deliberations. Already the Electronic Media Rules for the District Courts of Harris County in Houston civil proceedings explicitly prohibit "[e]lectronic media coverage of proceedings held in chambers, proceedings closed to the public, jury selection, and jury deliberations." *See* at http://www.justex.net/CivilMediaRules.html, Rule 4.1.

states, "[i]f this Code fails to provide a rule of procedure in any particular state of case which may arise, the rules of the common law shall be applied and govern."[12] The deliberations of a petit jury, like those of a grand jury, have always been secret under the common law of the State of Texas.[13]

Respondent's order indisputably puts *Frontline's* eyes and ears into the jury deliberation room through modern miracles of technology. If "the Fourth Amendment protects people, not places"[14] article 36.22 protects jurors, not jury rooms. The Supreme Court has held that modern technology, when it acts as the substitute for the eyes, ears, or noses of those who could not otherwise lawfully intrude upon a citizen's private domain, may be the legal equivalent of a person. In *Kyllo v. United States*,[15] the Supreme Court held that "obtaining by sense-enhancing technology [a thermal imaging device] any information regarding the interior of the home that could not otherwise have been obtained

without physical 'intrusion into a constitutionally protected area'... constitutes a search—at least where (as here) the technology in question is not in general public use."[16] Justice Scalia noted that this test "assures preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."[17] Similarly, barring remote-controlled cameras from videotaping secret jury deliberations assures preservation of that degree of privacy for jurors that existed when article 36.22 was first enacted.

"The secrecy of deliberations is the cornerstone of the modern Anglo American jury system."[18] Respondent contends, however, that there is only one purpose to be served by the secrecy of juror deliberations—protecting the jurors from outside influence and coercion. I disagree. Maintaining the secrecy of jury deliberations has traditionally been supported by five distinct rationales:

---

**12.** Tex.Code Crim. Proc. art. 1.27.

**13.** *See Stern v. State ex rel. Ansel*, 869 S.W.2d 614 (Tex. App.-Houston [14th Dist.] 1994, writ denied) (upholding removal of district attorney for distributing secret grand jury testimony to media). In *Stern*, the district attorney argued, in a removal lawsuit, that he did not violate any "law" in the State of Texas, because no statute expressly prohibited his conduct of handing out copies of grand jury testimony to the public. *Id.* at 619. The court of appeals held that the district attorney violated the common law purpose behind article 20.02 which, at that time, stated only that grand jury members and bailiffs are prohibited from divulging anything that transpired before the grand jury. *Id.* The court of appeals gave the grand jury secrecy statutes "the reasonable and liberal construction which will result in the accomplishment of the purposes for which they were enacted." *Id* at 620. There is no reason to think that the statutes concerning the secrecy of petit jury deliberations should be interpreted or applied in a less reasonable manner to achieve their purposes. Nor should it be

doubted that if a district attorney can be removed from his duly-elected office for divulging the secret proceedings of a grand jury, a judge may be commanded to rescind an order permitting a television cameraman from videotaping the secret proceedings of a petit jury.

**14.** *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**15.** 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001).

**16.** *Id.* at 34, 121 S.Ct. 2038. Even the dissent in *Kyllo* would use, as its test: Does the technology offer the "functional equivalent of access to a private place"? *Id.* at 48–49, 121 S.Ct. 2038 (Stevens, J., dissenting, joined by Rehnquist, C.J., O'Connor & Kennedy, JJ.). In this case, the remote controlled camera is the functional equivalent of Being There.

**17.** *Id.* at 34, 121 S.Ct. 2038.

**18.** *United States v. Thomas*, 116 F.3d 606, 618 (2d Cir.1997).

1. preventing tampering with the jury by outside influences; [19]

2. protecting the jury from post-verdict harassment; [20]

3. protecting the finality of jury verdicts; [21]

4. protecting robust freedom of debate during deliberations; [22] and

5. promoting community trust in the jury.[23]

**19.** *See, e.g., Tanner v. United States*, 483 U.S. 107, 117–23, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (reviewing history of secrecy of jury deliberation and concluding that Federal Rule of Evidence 606(b) prohibits any post-verdict proof of the internal operations of jury deliberations); *Stein v. New York*, 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953) (Justice Robert Jackson noting that courts have not "favored any public or private post-trial inquisition of jurors as to how they reasoned, lest it operate to intimidate, beset and harass them"); *Mattox v. United States*, 146 U.S. 140, 148–149, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (allowing post-trial inquiry into jury deliberations encourages jury tampering); FED.R.EVID. 606(b) advisory committee note ("[t]he mental operations and emotional reactions of jurors in arriving at a given result would, if allowed as a subject of inquiry, place every verdict at the mercy of jurors and invite tampering and harassment"). Protecting present jurors from their own willingness to be scrutinized by millions of television viewers also protects future jurors who might well avoid service to escape being placed in such a dilemma.

**20.** *See, e.g., McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) (noting that permitting jurors to attack their jury deliberations post-trial encourages juror harassment by the defeated party "to the destruction of all frankness and freedom of discussion and conference"); *Robinson Elec. Sup. Co. v. Cadillac Cable Corp.*, 706 S.W.2d 130, 132 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.) (stating that Texas Rule of Evidence 606(b) is designed to insulate the jury deliberation process from review, promote full discussion during deliberations, and reduce juror harassment).

**21.** *See, e.g., McDonald v. Pless*, 238 U.S. at 267–68, 35 S.Ct. 783 ("[l]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalididate the finding"); *United States v. Moten*, 582 F.2d 654, 664 (2d Cir.1978) (stating that unlimited attack on juror deliberations and verdicts, were it allowed, would undermine public interest in finality and cast judges as "Penelopes, forever engaged in unravelling the webs they wove").

**22.** As Justice Cardozo stated, "by immemorial tradition," "the arguments and votes of jurors ... are secret, protected from disclosure unless the privilege be waived.... Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world.'" *Clark v. United States*, 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *United States v. Thomas*, 116 F.3d 606, 618 (2d Cir.1997) (stating that " '[j]uror privacy is a prerequisite of free debate, without which the decisionmaking process would be crippled' "); *In re Globe Newspaper Co.*, 920 F.2d 88, 94 (1st Cir.1990) ("It is undisputed that the secrecy of jury deliberations fosters free, open and candid debate in reaching a decision").

**23.** *See, e.g.,* John H. Wigmore, *A Program for the Trial of Jury Trial*, 12 J. AM. JUD. SOC'Y 166, 170 (1929) ("[t]he jury, in the privacy of its retirement, adjusts the general rule of law to the justice of the particular case.... The jury, and the secrecy of the jury room, are the indispensable elements in popular justice"); *United States v. Thomas*, 116 F.3d at 618 ("disclosure of the substance of jury deliberations may undermine public confidence in the jury system"). As the Second Circuit explained in *Thomas:*

In cases that generate much attention or passion in the community, or that involve allegedly dangerous persons or organizations, the mere suggestion that the views of jurors may be conveyed to the parties and the public, even after the trial is over, understandably may cause anxiety and fear in jurors, and distort the process by which a

Although the *Frontline* cameraman would not be able to tamper with the jury by orally influencing their debate, all of the four other purposes of maintaining jury secrecy would be affected, in varying degrees, by the *Frontline* videotaping and broadcasting.

According to one commentator, our common-law policies of the sanctity and secrecy of jury deliberations

are seriously threatened by interviewing jurors after a trial. In recent years, the seriousness of this threat has grown by several magnitudes. Newspapers and radio programs have quoted jurors extensively, jurors have appeared singly or in groups on television, and some have written articles and even books about their experiences. Reporters have telephoned jurors at home to arrange postverdict interviews. Hung juries have been questioned on the reasons for their inability to reach a verdict. Even sequestered jurors have been pursued by the media and have had questions shouted at them.

Popular culture is now grossly at odds with the jury's history and function. Potential jurors are being taught that their deliberations will not be secret at all. They can expect to be interviewed. They will be asked for their reasons and those of their fellow jurors for convicting, acquitting, or being unable to agree.

And when they return an unpopular verdict, the postverdict "inquisition" by the media can easily take on the quality of attaint at common law, figuratively punishing jurors for doing their duty.

All this seems to have been happening in good faith, accompanied perhaps by a tinge of self-righteousness. To the media, the jury appears to be just another institution about which the public has a "right to know." [24]

Respondent argues that the educational value of this project is "self-evident," and that "[p]ublic confidence is furthered by a policy of openness in criminal trials and proceedings." I wholeheartedly agree with that general proposition. "A trial is a public event. What transpires in the court room is public property." [25] But the jury deliberation room is *not* the courtroom. Respondent also argues that "[w]hile the tradition of open access has heretofore been limited to courtroom proceedings in criminal cases, there is no reason to cut off access to the jury room door." As discussed above, there are *many* reasons for cutting off access at the jury room door. Those reasons have served the Anglo–American system of justice well for many centuries. It is not the place of this Court to overturn those centuries of law absent specific and explicit legislative directives. If the Texas Legislature should decide to throw open the door of the jury delibera-

verdict is reached; actually making such information available to the public might invite the retribution that jurors would rightly fear.

The jury system incorporated in our Constitution by the Framers was not intended to satisfy yearnings for perfect knowledge of how a verdict is reached, nor to provide assurances to the public of the primacy of logic in human affairs. Nor was it subordinated to a "right to know" found in the First Amendment. The jury as we know it is *supposed* to reach its decisions in the mystery and security of secrecy . . .

*Id.* at 619 (emphasis in original). If jury deliberations become public property, "previously anonymous jurors, reaching a group decision based on 'community values' and lay perspectives, will feel they must justify it in the court of public opinion." Abraham S. Goldstein, *Jury Secrecy and the Media: The Problem of Postverdict Interviews*, 1993 U. Ill. L.Rev. 295, 314.

24. Goldstein, supra note 22 at 296–97 (footnotes omitted).

25. *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947).

tion room, it may do so. Until then, the door stays closed under article 36.22 and American common law.

*Frontline* argues that its program will be entirely educational and informative, and not a sensational "Survivor-type reality show" as suggested by Relator.[26] Perhaps so, but I agree with those two Maine justices who, when asked whether to permit filming of jury deliberations, concluded that "[t]he public would be better served by a documentary that emphasized, rather than intruded upon, the confidentiality of juror deliberations and the protection afforded the public from any abuses of that process."[27]

### III.

The final issue is whether the district attorney is entitled to relief by mandamus. As Judge Keasler correctly notes, the mere fact that an order might be "terrible," "shocking," or "appalling,"[28] is not sufficient to have it rescinded via mandamus. Our mandamus jurisdiction is very limited. Mandamus is available only if the relator can demonstrate that: 1) he has no other adequate remedy at law;[29] and 2) under the relevant law and facts, the respondent "clearly abused" his discretion or

the act sought to be compelled is "purely ministerial."[30]

The relief sought under either phraseology must be "clear and indisputable" such that its merits are "beyond dispute."[31] Further,

> a "ministerial" act is one which is accomplished without the exercise of discretion or judgment. If there is any discretion or judicial determination attendant to the act, it is not ministerial in nature. Nor is a ministerial act implicated if the trial court must weigh conflicting claims or collateral matters which require legal resolution.[32]

Thus, for example, in *Banales*, we held that a trial judge did not have a ministerial duty to refrain from imposing certain specific conditions of probation on the defendant; he had the right to exercise judicial discretion in making that decision, wrong though it might be.[33] In *Hill*, we held that a trial judge did not have a ministerial duty to declare a "bail-pending-appeal" statute unconstitutional; he had the duty to exercise judicial discretion, regardless of whether he made the "correct" legal decision.[34] In *Gray*, we held that the trial judge did not have a ministerial duty to rule in a certain way on a plea of double jeopardy; he was exercising judicial discretion, even if incorrectly, in making his

---

26. I applaud the lofty goals and good intentions of both Respondent and *Frontline*, but that respect cannot alter the law or its application to this case.

27. Administrative Order, No. SJC–228, 1996 Me. LEXIS 32, at 5 (Me. Feb. 5, 1996) (Glassman & Rudman, JJ, statement in nonconcurrence).

28. *See post* at 221 & 224 (Keasler, J., dissenting).

29. Everyone agrees that Relator does not have an adequate remedy at law.

30. *See Banales v. Court of Appeals for the Thirteenth Judicial District*, 93 S.W.3d 33, 35 (Tex.Crim.App. 2002) *State ex rel. Hill v. Court of Appeals for the Fifth Dist.*, 34 S.W.3d 924, 927 (Tex.Crim.App.2001); *State ex rel. Curry v. Gray*, 726 S.W.2d 125, 128 (Tex. Crim.App.1987) (opinion on reh'g).

31. *State ex rel. Wade v. Mays*, 689 S.W.2d 893, 897 (Tex.Crim.App.1985).

32. *State ex rel. Curry v. Gray*, 726 S.W.2d at 128 (cite omitted).

33. 93 S.W.3d 33, 35.

34. 34 S.W.3d at 928.

ruling.[35] In all of these instances, mandamus relief was not available to compel a particular outcome because deciding that outcome involved a discretionary judicial act.[36] In all of those situations, the trial judge had a limited right to be wrong as long as there were at least legally viable options available.

The difference between those cases and the present one, however, is that in each of those cases, the act was a "discretionary judicial" one, directly related to the substantive or procedural rights of the parties. That is not true in the present situation.

Does Respondent's order in this case serve the substantive or procedural interests of *either* of the parties or of the fair administration of justice? The purpose of a criminal trial is to determine the guilt or innocence of a single individual; it is not for the benefit of television viewers or the media. They, like all members of the public, have a stake in seeing that trials are conducted fairly and reach accurate resolutions, but they are not the tail that wags the dog.

Here, the parties were preparing for a capital murder trial when a *third party*, unconnected to the criminal proceeding, entered the fray and asked for exclusive rights to film and broadcast the entire jury trial, including jury deliberations.[37] At first, the defense opposed *Frontline's* request, but eventually the defendant acquiesced and he, his mother, and his defense counsel signed a written consent to the procedure. In the process, he explicitly waived any post-verdict complaint he might have concerning the content of the videotape depicting the jury deliberations.[38] Thus, the defendant ostensibly "has no dog in this hunt." He has not filed any brief or taken any position in this mandamus proceeding. The capital murder defendant is not the real party in interest; *Frontline* is. But how does a television company have the right to a discretionary judicial ruling on exclusive access to those jury deliberations from which the public is excluded? [39] If the public were entitled to be in the jury deliberation room, then the press generally would have an equal right of access to the proceedings, but if the public is excluded, the press has no standing to assert a special or exclusive right of entry. Nor does it have any right to a "discretionary judicial ruling" on that "exclusive access" request because videotaping secret jury deliberations would not play "a significant

---

35. 726 S.W.2d at 128.

36. *Hill*, 34 S.W.3d at 927 n. 3.

37. Would any of us hesitate for a moment had the request been made by Aunt Tillie to sit quietly in the corner of jury deliberation room (or maybe hide in the janitor's closet peeping out of a hole), promising not to say a word, because she wanted the educational experience of seeing how jurors in a capital murder case debate these crucial issues? By what authority would any trial judge have to grant that request over the objection of a party? One laughs, but she is on her way. If *Frontline* is entitled to puts its eyes and ears into the jury room, why not Aunt Tillie?

38. The defendant did not, however, waive any right to complain that the recording of jury deliberations might deprive him of a fair trial or of impartial jurors, or that his attorneys provided ineffective assistance of counsel by consenting to the invasion of the jury deliberation room. However, at this point, we need not address the facial validity of those claims.

39. For example, suppose that *Frontline* had made its request for exclusive access and videotaping of the oral arguments to the United States Supreme Court. Surely no one would contend that *Frontline* was entitled to a "discretionary judicial ruling" from the Supreme Court on that request. That is an administrative decision, not a discretionary judicial ruling.

positive role in the functioning of the judicial process." [40]

Frontline's request is outside the realm of the type of "discretionary judicial ruling" contemplated in our mandamus jurisprudence. Suppose that the defendant and the jurors, as well as the State, had objected to *Frontline's* request. Would the respondent still not be subject to mandamus to rescind that order? If mandamus would lie then, why would it not when only one of the parties, the State, objects? Surely the State, as well as the defendant in a criminal trial, has a cognizable interest in a fair trial, fair jurors, and in the secrecy of the jury deliberations. If "the public has a right to know," as Respondent asserts, then it matters not whether *all* of the parties and *all* of the jurors object to the procedure. Conversely, if the public does *not* have a right to know, then the objection of any one of the parties or jurors suffices to close the door tightly.

The State posed the issue well: Suppose a trial judge ordered the jurors to disguise themselves in ski masks and speak Pig Latin during their deliberations. Would that order constitute a "discretionary judicial ruling" that is immune from mandamus relief? Of course not, Respondent stated: "[s]uch an order would certainly constitute an abuse of discretion because it is so arbitrary and unreasonable." Yes, but why is it arbitrary and unreasonable? Because that order has nothing to do with a "discretionary judicial decision." It does not contribute to the merits of the particular judicial proceeding. It does not, in any way, contribute to the fair and orderly administration of the criminal case on trial. It is unrelated to the accuracy of the truth-seeking mission of the particular trial. While a trial judge "may exercise broad discretion in controlling the courtroom," as asserted by Respondent, his first duty is to ensure a fair trial to both the defendant and the State.[41] Respondent's ruling has nothing to do with protecting the rights of the accused or the interests of the State in the fair adjudication of this particular case.

40. *Press–Enterprise Co. v. Superior Court of Cal., County of Riverside*, 478 U.S. 1, 11, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). In *Press–Enterprise*, the Supreme Court considered the exclusion of the public and press from a preliminary hearing in a criminal case and the denial of requests for transcripts of the proceedings. In setting out and weighing the factors courts should consider, the Court stated the following:

> In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a "tradition of accessibility implies the favorable judgment of experience," we have considered whether the place and process have historically been open to the press and general public.
> ....
> Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question. ....

... If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches.... "The presumption may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."

*Id.* at 8–9, 106 S.Ct. 2735 (internal citations omitted). Under this analysis, *Frontline's* request clearly does not meet the Supreme Court's constitutional threshold.

41. Tex.Code Crim. Proc. art. 2.03(b) ("[i]t is the duty of the trial court ... to so conduct [itself] as to insure a fair trial for both the state and the defendant ... and at the same time afford the public the benefits of a free press"); *see Randle v. State*, 826 S.W.2d 943, 946 (Tex.Crim.App.1992) (stating that while the court has broad discretion in controlling the trial conduct of counsel, parties and witnesses, it also has an independent duty to ensure a fair trial).

An act which is theoretically discretionary "may nonetheless be 'ministerial' in *application* if the facts and circumstances of a given case lead to but one rational course of action."[42]

While "to tape or not to tape," is a question that requires an answer, it is not a "discretionary judicial decision" requested by any party to the litigation or authorized by law.[43] Where is the source of the judicial authority to grant a particular member of the media exclusive access and rights to videotape secret jury deliberations in the face of a party's objection? Respondent points to no such source. The rights and interests of the parties and jurors in a criminal proceeding to the fair determination of the legal issues and the orderly administration of justice take precedence over the rights of non-litigant members of the media to special access to non-public proceedings.[44]

Therefore, I conclude that a trial judge lacks judicial authority[45] to enter an order granting rights to a third-party nonlitigant to videotape secret jury deliberations in a criminal trial over the objection of any party or of any juror. This law is not unsettled.[46] It is, and should remain, as firm as the Rock of Gibraltar. Although this specific scenario is a case of first impression in this state and apparently in any American jurisdiction, Respondent has not provided us with any case from any jurisdiction which has ever held otherwise, while the precedent upholding the secrecy of jury deliberations is legion. Respondent had a ministerial duty to deny *Frontline's* request when it was opposed by a party to this lawsuit.

Thus, I agree with the majority that Relator, the District Attorney of Harris County, is entitled to relief on mandamus.

KELLER, P.J., filed a dissenting opinion.

To show entitlement to mandamus relief, a relator must demonstrate two things: (1) there is no other adequate legal remedy, and (2) the act sought to be compelled is purely ministerial.[1] I believe that the

---

**42.** *Buntion v. Harmon,* 827 S.W.2d 945, 947 n. 2 (Tex.Crim.App.1992) (emphasis in original).

**43.** *See State v. Patrick,* 86 S.W.3d 592, 595–97 (Tex.Crim.App.2002) (mandamus proper when trial court acted beyond statutory authorization; noting that " 'implicitly authorized' acts must be in furtherance of some other action for which there is an explicit grant of jurisdiction"; because requirements of post-conviction DNA statute were not met, trial court did not have jurisdiction to order testing not Chapter 64 did not authorize).

**44.** *Cf. United States v. Thomas,* 116 F.3d 606 (2d Cir.1997). In *Thomas,* the Second Circuit held that "[w]here the duty and authority to prevent defiant disregard of the law or evidence comes into conflict with the principle of secret jury deliberations, we are compelled to err in favor of the lesser of two evils protecting the secrecy of jury deliberations at the expense of possibly allowing irresponsible juror activity." *Id.* at 623. If protecting the sanctity of jury deliberations is more impor-

tant than discovering the flagrant misconduct of those jurors, one cannot doubt that the secrecy of jury deliberations trumps any interest of a non-litigant member of the media to invade that jury room—even with the purest of motives—when opposed by any party or juror.

**45.** *See Patrick,* 86 S.W.3d at 594.

**46.** *See, e.g., State ex rel. Healey v. McMeans,* 884 S.W.2d 772, 774–75 (Tex.Crim.App.1994) (mandamus appropriate when relator demonstrated that respondent had a ministerial duty to vacate orders granting motions to quash "because the recognition of a 'newsman's privilege' is clearly contrary to well-settled law"; "[t]rial judges do not enjoy the freedom to ignore the law").

**1.** *Banales v. Court of Appeals for the Thirteenth Judicial District,* 93 S.W.3d 33, 35, (2002).

State fails to satisfy the second requirement, and therefore is not entitled to mandamus relief.

This Court has variously characterized a "ministerial act" as one that "does not involve the exercise of any discretion" or involves "a clear right to the relief sought."[2] We have explained that "the relief sought must be clear and indisputable such that its merits are beyond dispute."[3] We have further explained that, even for pure questions of law, the ministerial act requirement is not met if the law is unsettled or uncertain:

> Thus, under the ministerial act/clear legal right requirement, the law must clearly spell out the duty to be performed with such certainty that nothing is left to the exercise of discretion or judgment. Even a trial court's ruling on a pure question of law is not subject to writ review where that law was unsettled or uncertain. The act must be positively commanded and so plainly proscribed under the law as to be free from doubt.[4]

We reaffirmed these comments as recently as May of last year.[5]

Today, the State seeks to prevent the trial court from allowing an unmanned camera to be present in the jury room while the jury is deliberating on a death penalty case. Jury deliberations would be recorded and shown, after editing, upon a date after the conclusion of the trial. The defendant has agreed to the procedure. These circumstances present a case of first impression in this jurisdiction. Although we have found mandamus to be improper in several cases in which the issue presented was one of first impression, the denial of relief in each of those cases was based upon a finding that the law was unsettled or uncertain, not solely on the "first impression" nature of the case.[6] There are two situations in which the law is not "unsettled or uncertain" even when the case presents the judiciary with an issue of first impression. The present case is not one of those situations.

First, the ministerial act requirement is satisfied in a case of first impression if the respondent indisputably lacks jurisdiction or authority to engage in the act the relator seeks to prohibit. We confronted such a case in *State v. Patrick*, where the trial court ordered post-conviction DNA testing without statutory authority.[7] Because Patrick's case was already final, the trial court had jurisdiction to act only to the extent required to carry out the judgment or appellate mandate or where jurisdiction was specifically conferred by statute.[8] The trial court's order was not based upon the newly enacted post-conviction DNA statute,[9] and no application for writ of habeas corpus was pending at the time.[10] Consequently, there was no source of jurisdiction from which the trial court could

2. *State ex rel. Hill v. Court of Appeals for the Fifth District*, 34 S.W.3d 924, 927 (Tex.Crim. App.2001).

3. *Id.* at 927–928 (internal quotation marks omitted).

4. *Id.* at 928 (citations, ellipses, brackets, and quotation marks omitted).

5. *Banales*, at 35.

6. *Banales*, at 35; *State ex rel. Hill v. Court of Appeals for the Fifth District*, 67 S.W.3d 177, 181 (Tex.Crim.App.2001); *Hill*, 34 S.W.3d at 928.

7. 86 S.W.3d 592 (Tex.Crim.App.2002).

8. *Id.* at 594.

9. TEX. CODE CRIM. PROC., Art. 64.01, *et seq.*

10. *Patrick*, 86 S.W.3d at 594–595.

act, and so the trial court was indisputably without jurisdiction to issue its order.[11]

Unlike *Patrick*, the present case involves a pending prosecution, in which the trial court has general jurisdiction. When a trial court has such general jurisdiction, it is generally given broad discretion to conduct the trial—even to the point of implementing procedures that are not specifically authorized, so long as those procedures are not expressly forbidden: "The trial court is necessarily vested with broad discretion to conduct a trial. Such discretion is necessary to allow him to deal with the infinite variety of unusual situations . . . which can arise in the trial context." [12] For example, absent constitutional concerns, the trial court can order testimony by closed-circuit television, even where such a procedure is not specifically authorized by statute.[13] So, although no statute specifically authorizes the recording of jury deliberations, the trial court has the authority to permit such recording absent a statute or rule to the contrary.

That conclusion leads me to the second situation in which the ministerial act requirement may be satisfied in a case of first impression: where a statute is unambiguous concerning the conduct in question. In *Boykin v. State*, we established the rule of statutory construction that requires that we effectuate the plain meaning of a statute's language unless the language is ambiguous or leads to absurd results that the Legislature could not possibly have intended.[14] Part of the justification for the rule is that "the Legislature is constitutionally entitled to expect that the Judiciary will faithfully follow the specific text that was adopted." [15] Given our constitutional obligations to the Legislature, in an appropriate case, this Court should be prepared to enforce compliance with an unambiguous statute even though the Court has not yet had an occasion to address the matter. In the somewhat analogous situation of ineffective assistance of counsel claims, where the unsettled nature of the law will ordinarily defeat any claim that an attorney was ineffective, we have held that an attorney can be found ineffective when his failure to properly advise his client involves a statutory provision with clear language, even though the case is one of first impression.[16]

Article 36.22 of the Texas Code of Criminal Procedure provides, in relevant part: "No person shall be permitted to be with a jury while it is deliberating." [17] I believe that this statutory language does not unambiguously answer the question of whether the camera should be considered a "person" for purposes of the statute. It is not clear to me from the statutory language whether persons who *later* view the recorded deliberations can fairly be said to be "with" the jury at the time the jury deliberates, such that the statute may be said to prohibit the procedure proposed here. To hold that the statute proscribes the use of cameras proposed here, a court would have to look beyond the statutory

---

11. *Id.*

12. *Sapata v. State*, 574 S.W.2d 770, 771 (Tex. Crim.App.1978); *see also Wheatfall v. State*, 882 S.W.2d 829, 838 (Tex.Crim.App.1994), *cert. denied*, 513 U.S. 1086, 115 S.Ct. 742, 130 L.Ed.2d 644 (1995).

13. *Marx v. State*, 987 S.W.2d 577, 582–583 (Tex.Crim.App.), *cert. denied*, 528 U.S. 1034, 120 S.Ct. 574, 145 L.Ed.2d 436 (1999).

14. 818 S.W.2d 782, 785 (Tex.Crim.App.1991).

15. *Id.*

16. Ex parte *Welch*, 981 S.W.2d 183, 185 (Tex. Crim.App.1998).

17. TEX. CODE CRIM. PROC., Art. 36.22.

language and construe the statute with the aid of extratextual factors, including the legislative history, the purpose of the statute, and the consequences of a particular construction.[18]

I have serious doubts about whether extratextual sources can show a clear and indisputable right to relief. It may simply be impossible for the meaning of a statute with ambiguous language to be beyond dispute, however clear the extratextual factors may seem to be. The ambiguity of the statutory language would seem to create at least some doubt about the proper interpretation, and any such doubt defeats the ministerial act requirement for mandamus.

But even if one assumes that extratextual factors might, in an appropriate situation, render a statute's meaning beyond dispute, they do not do so here. Even if we were to assume *arguendo* that we would ultimately reject Respondent's arguments and find the State's arguments more persuasive, that is not the same as rendering an issue indisputable, free from all doubt.[19]

I respectfully dissent.

KEASLER, J., delivered this dissenting opinion.

In a well-intentioned, understandable, principled effort to prevent a genuine disaster in our State's criminal jury system, the majority has regrettably created law

where there is none. I must reluctantly dissent.

## I.

Cedric Harrison is charged with the capital murder of Felix Sabio. The State is seeking the death penalty. On November 11, three days before jury selection was set to begin, Co–Production filed a motion requesting permission to record and broadcast the entire capital murder trial, including the jury's deliberations. Harrison consented to the filming, but the District Attorney objected. Judge Poe granted the request and ordered the trial filmed.

The District Attorney then filed a petition for writ of mandamus in this Court, seeking to prevent Judge Poe from authorizing the taping. We granted a stay of the criminal trial proceedings and filed and set this case for submission.

## II.

It goes without saying that Judge Poe's order is shocking. The thought of recording and later televising a jury's deliberations is appalling. As the amici point out, we are guided in our criminal justice system by "the cardinal principle that the deliberations of the jury shall remain private and secret in every case."[1] Indeed, "[f]reedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to

---

18. *See Brown v. State*, 943 S.W.2d 35, 37–38 (Tex.Crim.App.1997); Tex. Gov't.Code, § 311.023.

19. Relying upon standing concepts associated with errors under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the State also contends that it is entitled to assert the rights of jurors who were excused because the camera would affect their deliberations. But error is forfeited by the failure to object. *Saldano v. State*, 70

S.W.3d 873 (Tex.Crim.App.2002); *see also Cockrell v. State*, 933 S.W.2d 73, 94 (Tex. Crim.App.1996), *cert. denied*, 520 U.S. 1173, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997)(*Batson* error forfeited by failure to object). Here, the State waived the error by agreeing to the excusal of the jurors in question.

1. *United States v. Virginia Erection Corp.*, 335 F.2d 868, 872 (4th Cir.1964).

the world."[2] Additionally, "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct."[3] Even we have recognized that "[t]he deliberations of a jury are required to be kept secret."[4]

In his concurring opinion, Judge Price implies that because Judge Poe had pure motives, and because his order does not violate the law, the order therefore cannot be shocking. Nothing could be further from the truth. Indeed, the most shocking of actions are often justified as having originated from the purest of motives. And as former Supreme Court Justice Potter Stewart said, "there is a big difference between what you have a right to do and what is right to do." Just because the order did not violate any law does not make it any less shocking.

Co–Production points out that other courts have recorded and later televised jury deliberations, including a Milwaukee criminal trial and several Arizona criminal trials.[5] But it has never been done when one of the parties objects, as here. And it has certainly never been done in a capital murder trial in which the State seeks the death penalty. The stakes are higher today than ever before.

## III.

The District Attorney argues that Judge Poe's order violates Art. 36.22 and Rule 606(b) of the Rules of Evidence. He claims these two provisions create a "zone of privacy" around jury deliberations. Judge Poe responds that the District Attorney has failed to satisfy the requirements of mandamus relief because he fails to establish that a ministerial duty has been violated. He further argues that other courts nationwide have videotaped jury deliberations, to no detriment to the justice system.

## IV.

Mandamus is an extraordinary remedy to be invoked sparingly.[6] Its issuance is never a matter of right but rests in the sound discretion of the Court.[7] To obtain mandamus relief from this Court, a relator must show: (1) a clear right to relief, as when the judicial conduct in question violates a ministerial duty; and (2) no adequate remedy at law to redress the alleged harm.[8] The District Attorney has no right to appeal Judge Poe's order before deliberations begin,[9] so he establishes that he has no adequate remedy at law. The issue in this case is whether Judge Poe's order violates a ministerial duty.

An act is ministerial if it does not involve the exercise of any discretion.[10] If there is

**2.** *Clark v. United States*, 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993 (1933).

**3.** *Tanner v. United States*, 483 U.S. 107, 120, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).

**4.** *Alsup v. State*, 118 Tex.Crim. 388, 39 S.W.2d 902, 903 (1931).

**5.** See William R. Bagley, Jr., Note, "Jury Room Secrecy: Has the Time Come to Unlock the Door?", 32 Suffolk L.Rev. 481, 485 (1999); Clifford Holt Ruprecht, Comment, "Are Verdicts, Too, Like Sausages?: Lifting

the Cloak of Jury Secrecy," 146 U. Pa. L.Rev. 217, 224 (1997).

**6.** *State ex rel. Holmes v. Honorable Court of Appeals for Third Dist.*, 885 S.W.2d 389, 392 (Tex.Crim.App.1994).

**7.** *Smith v. Gohmert*, 962 S.W.2d 590, 592 (Tex.Crim.App.1998).

**8.** *State ex rel. Rodriguez v. Marquez*, 4 S.W.3d 227, 228 (Tex.Crim.App.1999).

**9.** *See* Art. 44.01.

any discretion or judicial determination attendant to the act, it is not ministerial, nor is it a ministerial act if the trial court must weigh conflicting claims or collateral matters which require legal resolution.[11] The law must spell out the duty to be performed with such certainty that nothing is left to the exercise of discretion or judgment.[12] Even a trial court's ruling on a pure question of law is not subject to writ review if that law is unsettled or uncertain.[13] We have also described the ministerial act requirement as a requirement that the relator have a clear right to the relief sought.[14] The relief sought must be clear and indisputable such that its merits are beyond dispute.[15] The act must be positively commanded and so plainly prescribed under the law as to be free from doubt.[16]

Article 36.22 provides as follows:

> No person shall be permitted to be with a jury while it is deliberating. No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court.

The statute was enacted in 1965 when our entire Code of Criminal Procedure was rewritten and codified. The predecessor to Art. 36.22 was Art. 671, enacted in 1925. That statute provided as follows:

> No person shall be permitted to be with a jury while they are deliberating upon a case, nor be permitted to converse with a juror after he has been impaneled, except in the presence and by the permission of the court, or except in a case of misdemeanor where the jury have been permitted by the court to separate. No person shall be permitted to converse with the juror about the case on trial.

The question in this case is whether allowing a camera in the jury room to record the jury while it is deliberating violates the statute's proscription against a "person" being with the jury. The majority concludes that "each of the millions of viewers of the videotape is a person" and that "the playing of the videotape (live or not) permits these persons to 'be with the jury while it is deliberating'."[17] But this is simply not the case. While each viewer is indeed a person, the viewers will not be with the jury while the jury is deliberating. Instead, the viewers will be viewing the jury long after the jury has deliberated.

In her concurring opinion, Judge Cochran surmises that the cameraman, if no one else, will be "with" the jury while it is deliberating. She bases this assumption on her viewing of the video of another jury's deliberations and her supposition that "presumably"[18] the same thing will occur here. But nothing in the record before us indicates that in this case there will be a live cameraman viewing the jury as it deliberates. Indeed, at oral argu-

---

10. *State ex rel. Hill v. Court of Appeals for Fifth Dist.*, 67 S.W.3d 177, 180 (Tex.Crim. App.2001).

11. *Id.*

12. *Id.* at 180–81.

13. *Id.* at 181.

14. *State ex rel. Hill v. Court of Appeals for Fifth Dist.*, 34 S.W.3d 924, 927 (Tex.Crim. App.2001).

15. *Id.* at 927–28.

16. *Id.* at 928.

17. *Ante*, slip op. at 201.

18. *Ante*, slip op. at 196–97 n. 2 (Cochran, J., concurring).

ment Co–Productions' counsel assured this Court that the camera would not be manned. Finding a violation of Art. 36.22 requires an assumption of facts not in the record and directly contradicted at oral argument.

The District Attorney's reliance on Evidence Rule 606(b) is equally unfounded. Rules of evidence do not come into play until trial proceedings begin. Judge Poe's order cannot possibly violate a rule of evidence when the trial has not yet begun. Moreover, Rule 606(b) prohibits a juror from testifying regarding deliberations. Television is not trial testimony, so nothing about Judge Poe's order violates the rule.

The majority states that "videotaping the jury deliberations with an unattended camera does introduce an 'outside influence and pressure' on the jury while it is deliberating." [19] I wholeheartedly agree. But that is not the question before us. The question is not whether videotaping the jury's deliberations is a good idea. It is a terrible idea. The issue, however, is only whether videotaping the jury constitutes a "clear" violation of Art. 36.22.

The majority states that "mandamus can lie to compel compliance with even an ambiguous statute." [20] I disagree. Mandamus is only available when there is a "clear right to the relief sought." [21] Ambiguous is the opposite of clear. If a statute is ambiguous, there should be no entitlement to mandamus relief on a claim that a judge violates that statute.

Regardless, in this case the majority does not find Art. 36.22 ambiguous. Instead, it finds that the plain language of the statute "clearly and indisputably prohibits the videotaping of jury delibera-

tions." [22] The majority and I must be reading two different statutes. While I agree that videotaping jury deliberations ought to be prohibited by law, I find nothing in the plain language of Art. 36.22 which mentions televising, videotaping, or recording of any kind. The statute just does not encompass this activity. Indeed, how could it? When the predecessor statute was enacted in 1925, television was the stuff of science fiction.

My heart is with the majority, but my mind cannot agree. As much as I would like to grant the District Attorney mandamus relief and prevent Co–Production from recording the jury's deliberations, I find no "clear and indisputable" [23] duty for Judge Poe to vacate his order.

### V.

The ramifications of my position are not as extreme as they may appear to be. As the majority notes, there is legislation pending at this moment to prohibit recording jury deliberations. Senate Bill 164 was filed January 6th and referred to the Senate's Jurisprudence Committee on January 30th. An identical House Bill 466 was filed January 21st. Both bills seek to add an Art. 36.215 to the Code which would prohibit a person from using "any device to produce or make an audio, visual, or audio-visual broadcast, recording, or photograph of a jury while the jury is deliberating." Both bills, as currently written, apply only to trials "commenced on or after September 1, 2003."

But if my position were to prevail, either bill could be amended to apply retroactively to any trial currently pending, as long as jury deliberations have not yet begun.

---

19. *Id.*

20. *Id.* at 200.

21. *Hill,* 34 S.W.3d at 927.

22. *Ante,* slip op. at 202.

23. *Hill,* 34 S.W.3d at 927–28.

A retroactive application would not offend the ex post facto clause since the subject pertains to a procedural issue rather than a substantive right.[24]  Additionally, either bill could be rushed through the legislative process, signed quickly into law, and given an immediate effective date, rather than the delayed date of September 1, 2003.  If this were to occur, the new statute could affect this very case.  So denying mandamus relief to the District Attorney would not necessarily result in the recording of the jury deliberations in this case.  The legislature and the Governor could prevent it.

Additionally, if my opinion were to prevail and the legislature did not act promptly to prohibit the trial court's action in this case, it would not mean the end of confidential jury deliberations.  This would be one case, an aberration which would, at most, result in the airing on television of a single jury's most secret deliberations.  I would hate to see it happen.  But it would be an isolated case, an action that would never be repeated in Texas, assuming the new legislation passes.

I respectfully dissent.

---

24.  *Ibarra v. State,* 11 S.W.3d 189, 192 (Tex. Crim.App.1999) (retroactive laws provision of Texas Constitution operates only to prohibit the application of statutes which disturb vested, substantive rights;  laws altering procedure do not fall within prohibition).