Becker v. State











COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS




LORENZO GARCIA,


 Appellant,


V.


THE STATE OF TEXAS,


 Appellee.


§


 


§


 


§


 


§


 


§


 


 § 

No. 08-02-00085-CR



Appeal from the


210th District Court


of El Paso County, Texas


(TC# 2001-0D0-1248)


M E M O R A N D U M O P I N I O N


 Lorenzo Garcia appeals his conviction of capital murder. A jury found Appellant
guilty, and the trial court automatically set punishment at life imprisonment as the State did
not seek the death penalty. See Tex. Code Crim. Proc. Ann. art. 37.071, § 1 (Vernon Supp.
2004). We affirm the judgment of the trial court.

I. FACTUAL SUMMARY


 On the morning of January 13, 2001, sixteeen-month-old Andrian Ramirez was left
with Appellant, the mother's boyfriend, while she went to work. Appellant and Ramirez's
mother lived together in an apartment. When Ramirez's mother left him that morning, he
had been eating well, playing with toys, and had no fever, but he had experienced some
diarrhea over the last couple of days. 

 At around noon on this same date, Rebecca Vasquez was asleep in an adjacent
apartment when she was awakened by a baby crying in Appellant's apartment. She heard a
man making a sound like a person who was making a physical effort and something heavy
banging on the wall. Vasquez then heard something "really heavy" fall in the shower. She
heard the baby crying again but it stopped. Vasquez went back to sleep. 

 At approximately 1:30 p.m., emergency personnel were dispatched to Appellant's
apartment. The officers who arrived first found Appellant with Ramirez in the bathroom
attempting to perform CPR. Ramirez was naked on the bathroom floor, had no pulse and
was not breathing. Officers noticed bruising on his body, including his pelvis and upper
arms. Appellant told the paramedics that he was in the process of giving Ramirez a bath
when he suddenly stopped breathing. Appellant said that he left Ramirez in the shower for
a few minutes while he went into the other room. When he heard Ramirez stop singing and
talking, he went back into the bathroom to check on him and found Ramirez doubled over
in a pool of his own vomit. The officers noticed that Ramirez was dry and did not have any
vomit on him. However, a child's shirt on the bathroom floor appeared to have vomit on it. 
When asked about the bruising, Appellant told EMS personnel that Ramirez was learning to
walk and often fell down. EMS was successful in restarting Ramirez's heart and transported
him to William Beaumont Army Medical Hospital, the nearest medical facility. During
transport, EMS personnel noticed that the bruises on Ramirez's body became more
pronounced and additional bruises appeared. Ramirez arrived at the hospital in a deep coma
and showed little evidence of brain activity. He was pronounced dead the following day,
January 14, 2001. Dr. Corrine Stern, Chief Medical Examiner for El Paso County, performed
an autopsy and determined the cause of death to be blunt-force injuries to Ramirez's head. 
 A grand jury indicted Appellant for the capital murder of Ramirez. The indictment
alleged that Appellant intentionally and knowingly caused the child's death by striking
Ramirez's head with an object unknown to the grand jury or by striking his head against an
unknown object. The jury found Appellant guilty of capital murder as alleged in the
indictment. 

II. DISCUSSION

 In Issue Number One, Appellant contends that the evidence is factually insufficient
to prove two elements of capital murder: (1) that the striking of Ramirez's head with or
against an object was the cause of his death; and (2) that Appellant acted intentionally or
knowingly. 

A. Standard of Review


 When conducting a factual sufficiency review, we consider all of the evidence, both
admissible and inadmissible, but we do not view it in the light most favorable to the verdict. 
Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); Levario v. State, 964 S.W.2d
290, 295 (Tex. App.--El Paso 1997, no pet.). We review the evidence weighed by the jury
that tends to prove the existence of the elemental fact in dispute and compare it with the
evidence that tends to disprove that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 
2000); Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996), cert. denied, 522 U.S.
832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). A defendant challenging the factual sufficiency
of the evidence may allege that the evidence is so weak as to be clearly wrong and manifestly
unjust, or in a case where the defendant has offered contrary evidence, he may argue that the
finding of guilt is against the great weight and preponderance of the evidence. See Johnson,
23 S.W.3d at 11. Although we are authorized to set aside the fact finder's determination
under either of these two circumstances, our review must employ appropriate deference and
should not intrude upon the fact finder's role as the sole judge of the weight and credibility
given to any evidence presented at trial. See Johnson, 23 S.W.3d at 7. We are not free to
reweigh the evidence and set aside a verdict merely because we feel that a different result is
more reasonable. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Clewis, 922
S.W.2d at 135.

B. Cause of Death


 With respect to the cause of death, Appellant argues that because only one medical
expert, Dr. Stern, concluded that Ramirez died of blunt-force trauma to the head and her
opinion is not supported by objective medical data, the evidence is factually insufficient. We
disagree. Dr. Tyler James treated Ramirez in the emergency room. Ramirez was
unresponsive to all stimuli and was in shock. His body temperature was well below normal. 
They provided IV fluids and warmed Ramirez's body as supportive measures and in an effort
to make him responsive. Dr. James observed multiple bruises to the forehead, arms and
buttocks, and a large bruise to the abdominal wall. Given these injuries, Dr. James suspected
the child had received multiple blows from a blunt object. His differential diagnoses
included sepsis, non-accidental trauma (intentional assault), subarachnoid hemorrhage
(bleeding into the brain), epidural hemorrhage (bleeding into the brain), subdural hemorrhage
(bleeding into the brain), intra-abdominal trauma, sepsis, overdose, hypothermia, electrolyte
disturbance, and seizures. Dr. James explained the concept of differential diagnosis for the
jury as follows: when a patient, such as Ramirez, is totally unresponsive, a physician
considers all of the possible causes for the patient's condition. During the subsequent
evaluation, the physician either rules in or rules out the differential diagnoses. Based on
testing performed that day, Dr. James ruled out sepsis, anemia, platelet dysfunction, and
leukemia. Additionally, there was no evidence of seizure disorder. Clotting tests (PT, PTT,
and APPT) were abnormally high, indicating to Dr. James that Ramirez was in shock due to
an injury which had caused excessive bleeding. Ramirez's hypothermia indicated to Dr.
James that the child had been exposed to excessive cold or his body's normal mechanism for
warming itself was not functioning properly. A chest X-ray revealed that Ramirez had a
pulmonary contusion of the right upper lobe and left lower lobe of his lungs. A CT scan of
the head showed bleeding in the left frontal area of the brain, while a CT scan of the
abdomen ruled out internal bleeding in the abdomen. The CT scan also showed a blunting
of the gray white interface of the brain. In a normal CT scan of the brain, the structures of
the brain are very well demarcated and there is a clear line where the gray and white matters
converge. With significant swelling of the brain, however, the lines are no longer sharp. 
During the course of treatment and as circulating blood volume was restored, the bruising
on Ramirez's body became more prominent. The bruising to the forehead and the results of
the CT scan caused Dr. James to suspect that Ramirez had been beaten. Ramirez was
admitted to the Intensive Care Unit and a pediatric consult was obtained. The pediatric
consult report listed nine diagnoses: (1) anoxic brain injury (lack of oxygen to brain) with
front frontal bleed; (2) a coded diagnosis unknown to Dr. James; (3) cardiac arrest; (4) 
multiple bruises; (5) multiple contusions; (6) blunt chest trauma; (7) hypothermia; (8)
pulmonary contusions; and (9) child physical abuse. In Dr. James' opinion, no medical
condition or disease process accounted for Ramirez's condition and injuries. His injuries
were not consistent with having been self-inflicted, spontaneous, or the result of a clumsy
child falling down, nor were they consistent with Appellant's statement that Ramirez had
been fine one moment and unconscious the next. 

 Dr. Teras Masnyk, M.D., the Chief of the Neurosurgery Service at William Beaumont,
saw and treated Ramirez shortly after his admittance to ICU. He noted that Ramirez was in
a deep coma, unresponsive to any stimulus, and showed little evidence of brain activity. Dr.
Masnyk explained that Ramirez's hypothermia may have been caused by the lack of brain
activity. Dr. Masnyk observed numerous bruises on different parts of Ramirez's body. 
Photographs taken of Ramirez in ICU and admitted at trial depict these bruises. Ramirez had
an anoxic brain injury which occurs when the brain does not receive enough blood flow or
oxygen to maintain its activity and keep itself alive. There can be different causes of an
anoxic brain injury such as cardiac arrest, strangulation, or suffocation which interrupts the
flow of blood to the brain. Trauma can also lead to anoxic brain injury if it causes sufficient
intercranial pressure. Dr. Masnyk noted that swelling of the brain tissue was not apparent
on the CT scan. In Dr. Masnyk's expert opinion, the bruising seen on Ramirez could not be
explained by a clumsy child falling down or otherwise self-inflicted. While there are
conditions which can lead to spontaneous bruising, such as platelet dysfunction, those
conditions were not found in Ramirez. 

 Dr. Scott Coleman, Ramirez's pediatrician, had seen the child from the time he was
a few days old until he was nine months old. Ramirez did not have any overt signs of a blood
disorder during the time Dr. Coleman treated him. Dr. Coleman, who is familiar with the
types of injuries suffered by toddlers who are learning to walk, reviewed the photographs
depicting the bruises on Ramirez's body. In his expert opinion, the bruising was not
consistent with the type of bruises or injuries found on a child who is learning to walk. 
Additionally, Dr. Coleman testified that there is no medical condition which would account
for the injuries on Ramirez's body. 

 The medical examiner, Dr. Stern, described the injuries she found during the autopsy
of Ramirez. She found three separate bruises on the buttocks, multiple bruises on the bottom
of the right foot, a large contusion to the right elbow, two bruises on the inside of the right
arm, six bruises on the abdomen, a bruise below the knee, a bruise on the upper left cheek
and one on the left side of the head, a bruise on the mid-anterior scalp, and another on top
of the nose. Her testimony is supported by photographs of these injuries. Dr. Stern also
found internal injuries. Ramirez had hemorrhage in the mesentery (the attachment which
holds the small and large intestines down) caused by blunt-force trauma. This injury
corresponded to the bruising on the abdomen. Dr. Stern also found five separate subgaleal
hemorrhages from five separate impact sites on the inside of the scalp. Four of the
hemorrhages were on the front of the head and a large or diffuse hemorrhage which covered
the back of the head. These hemorrhages, which matched the external bruises observed on
the head, were caused by blunt-force trauma, namely, his head being struck by a hard object
or by his head striking against a hard object. The large injury to the back of the head was
consistent with Ramirez's head being struck against a hard surface. When Dr. Stern removed
the cranial vault, she found 75 milliliters of liquid blood located in the area between the dura
and the brain. Subdural hemorrhage is associated with the tearing of the bridging veins that
hold the dura close to the brain. This type of injury is commonly caused by blunt force
trauma. Even 50 milliliters of blood in the subdural space is enough to cause loss of
consciousness and even death. With this type of brain injury, a child would become
unconscious within an hour. She explained that subarachnoid and subdural hemorrhages are
difficult to detect by CT Scan and MRI, and consequently, clinicians often do not pick them
up. Dr. Stern did not find any evidence of any disease process in Ramirez that contributed
to his death. In Dr. Stern's opinion, Ramirez died of blunt force injuries to the head caused
by his head striking a hard surface or a hard object striking his head. 

 Dr. James Algeo, Jr., a diagnostic radiologist and former Chief of Radiology at
William Beaumont, testified on behalf of the defense. Dr. Algeo reviewed the various
imaging studies performed on Ramirez, the lab reports, and Dr. Stern's autopsy report. Dr.
Algeo did not see any evidence on the imaging studies of brain edema or subarachnoid,
epidural, or subdural hemorrhage and he concluded that Ramirez did not die as the result of
blunt force trauma. Dr. Algeo conceded on cross-examination that trauma to the brain is not
always evident on MRI or CT scan and that subdural hemorrhage can be missed. Ultimately,
Dr. Algeo stated that he did not disagree with Dr. Stern's findings. Dr. Randy Goldstein,
a resident who practices emergency medicine in El Paso, also testified on behalf of
Appellant. Dr. Goldstein is board certified in pediatrics but he had not completed his
residence in emergency medicine at the time of trial. He reviewed the autopsy report,
ambulance records, emergency room records and in-patient records from William Beaumont
related to Ramirez. Dr. Goldstein found it unlikely that Ramirez died as the result of blunt
force trauma to the head. He did not believe that the bruising on Ramirez's body represented
the type of "classic" bruising seen in child abuse cases, but he agreed that Ramirez had
suffered at least one impact injury to the head and the other bruising could possibly have
been caused by child abuse. Dr. Goldstein admitted that 75 milliliters of blood in a toddler's
skull is a significant amount of blood but he could not definitively say whether it would cause
a fatal compression of the brain. He insisted, however, that such brain compression would
have been seen on a CT scan or MRI and it was not. Dr. Goldstein believed Ramirez's
hypothermia and the lab reports indicated Ramirez may have died as the result of sepsis
followed by septic shock and cardiac arrest. Dr. Goldstein conceded that there could be
disagreement regarding his interpretation of the objective medical evidence, stating: "That's
the art of medicine." 

 Dr. Stern, who had listened to Dr. Goldstein's testimony, was recalled by the State in
rebuttal. She disagreed with Dr. Goldstein's conclusions, pointing out that his medical
training did not include the mechanics of how injuries are inflicted. Characterizing her
conclusion as an objective medical finding, she adhered firmly to her opinion that Ramirez
died from blunt force trauma to the head. She supported her finding by pointing out that she
found both sub-dural and sub-arachnoid hemorrhage during the autopsy and she described
for the jury photographs which depicted these injuries. Her finding of blunt force trauma was
also supported by the finding of multiple impact sites on Ramirez's head. Citing standard
American and British medical texts, she disagreed with Dr. Goldstein's conclusion that 75
milliliters of subdural hemorrhage would not necessarily cause a child to lose consciousness
or otherwise become symptomatic. Some texts state that 35 milliliters is enough to cause an
adult to become symptomatic. Much less would be required to cause a child to become
symptomatic because their cranial vaults are much smaller than an adult. Dr. Stern did not
find any evidence of sepsis. Dr. Goldstein relied on several laboratory findings to support
his conclusion that Ramirez died as the result of sepsis: an increase in liver enzymes, a
decrease in white blood count, an increase in clotting factors, a decrease in hemoglobin and
hematocrit, and an increase in glucose. Dr. Stern, however believed these laboratory results
were consistent with her conclusions because these laboratory results are consistent with a
person who is in cardiogenic shock with a severe head injury. A recent study of 1,000
children who had suffered blunt force trauma showed that 77 percent of the children had
elevated PT and PTT's on admission. More than half of the children had markedly elevated
PT and PTT readings. 

 The evidence at trial showed that Ramirez died from anoxic brain injury. The cause
of this anoxic brain injury was disputed. Dr. Goldstein concluded it was due to a progression
of sepsis, septic shock and cardiac arrest while Dr. Stern found that the cause of Ramirez's
death was blunt force trauma to the head. While Dr. Goldstein conceded that Ramirez had
suffered at least one blow to his head, he dismissed the possibility of intentional trauma
causing Ramirez's death because he believed the bruising on the child's body could be the
result of a disease process or perhaps from minor falls as Ramirez learned to walk. Every
other medical expert said that there was no medical condition or disease process which would
account for the bruising seen on Ramirez's face, head, arms, buttocks, abdomen, and bottom
of his foot. Likewise, none of the other medical experts believed that the bruising could be
explained by Ramirez falling as he learned to walk. Contrary to Appellant's argument, Dr.
Stern's conclusion regarding the cause of death is supported by objective medical findings. 
In finding Appellant guilty, the jury chose between competing views and interpretations of
the objective medical findings. We conclude that the jury's determination that Ramirez died
as the result of blunt force trauma is supported by factually sufficient evidence.

C. Culpable Mental State


 Conceding that there is evidence he abused Ramirez, Appellant argues that the
evidence is factually insufficient to prove that he acted with an intent to kill Ramirez or that
he knew his conduct was reasonably certain to cause that result. Because capital murder is
a result-of-conduct offense, the State must prove that the defendant possessed the requisite
culpable mental state with respect to the result, namely, the death of the victim. See Medina
v. State, 7 S.W.3d 633, 639 (Tex. Crim. App. 1999). A person acts intentionally, or with
intent, with respect to a result of his conduct when it is his conscious objective or desire to
cause the result. Tex. Pen. Code Ann. § 6.03(a) (Vernon 2003). A person acts knowingly,
or with knowledge, with respect to a result of his conduct when he is aware that his conduct
is reasonably certain to cause the result. Tex. Pen. Code Ann. § 6.03(b) (Vernon 2003). 
Intent is a fact question for the trier of fact. Manrique v. State, 994 S.W.2d 640, 649 (Tex.
Crim. App. 1999); Wallace v. State, 52 S.W.3d 231, 234 (Tex. App.--El Paso 2001, no pet.). 
Proof of the requisite culpable mental state generally relies on circumstantial evidence. 
Gardner v. State, 736 S.W.2d 179, 182 (Tex. App.--Dallas 1987), aff'd, 780 S.W.2d 259
(Tex. Crim. App. 1989); Menchaca v. State, 901 S.W.2d 640, 652 (Tex. App.--El Paso 1995,
pet. ref'd). Intent and knowledge can be inferred from the acts, words and conduct of the
accused, including the surrounding circumstances. Dues v. State, 634 S.W.2d 304, 305 (Tex.
Crim. App. 1982); Menchaca, 901 S.W.2d at 652.

 Approximately an hour before emergency services were summoned to the apartment,
a neighbor heard a baby crying in the bathroom, the sound of a man making an effort, and
something "really heavy" banging on the wall and falling to the floor of the shower. The
evidence at trial showed that Ramirez had five separate impact sites on his head caused by
a hard object striking his head or his head striking a hard object. One or more of these blows
was sufficiently violent to tear the bridging veins which caused bleeding in the brain. 
Additionally, Ramirez also suffered a hemorrhage in the abdominal mesentery from blunt
force trauma to the abdomen. Numerous other fresh bruises were found on his body. This
evidence is factually sufficient to support a conclusion that Appellant intended to cause
Ramirez's death by applying blunt force to his head or that he was reasonably certain his
conduct would cause that result. Issue Number One is overruled.

JURY MISCONDUCT


 In Issue Number Two, Appellant contends that a new trial should have been granted
due to jury misconduct. Citing Rule 21.3(f) of the Texas Rules of Appellate Procedure,
Appellant asserts that the jury received other evidence after it retired to deliberate.



 Rule 21.3(f) provides that in a criminal case, a defendant must be granted a new trial: 

 when, after retiring to deliberate, the jury has received other evidence; when
a juror has talked with anyone about the case; or when a juror became so
intoxicated that his or her vote was probably influenced as a result;


Tex. R. App. P. 21.3(f).

 Appellant raised his jury misconduct complaint in a motion for new trial and
supported it by affidavits of the jury foreperson, Benny McGehee, and juror Glenn Lane
Stewart. McGehee stated that he had an understanding of anoxic brain injury as the result
of his medical background, and he discussed his understanding with the jury. He also knew
that blood could have been present in the brain on the 13th even if not apparent on the CT
scan. Stewart said that McGehee's explanation of anoxic brain injury had an impact on three
other jurors. At the hearing on the motion for new trial, Appellant introduced his motion for
new trial and supporting affidavits over the State's objection based on Rule 606(b) of the
Texas Rules of Evidence. Appellant additionally offered the live testimony of juror Erica
Green who testified that she relied on information provided by McGehee during
deliberations. The trial judge also overruled the State's objection to Green's testimony, but
stated that if the State was correct in its contention about the impact of Rule 606(b), he would
disregard the evidence. The court subsequently overruled the motion for new trial.

 Granting or denying a motion for new trial is within the trial court's discretion. 
Salazar v. State, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). An appellate court may not
substitute its judgment for that of the trial court. Id. Instead, we must decide whether the
trial court's decision was arbitrary or unreasonable. Id. As the sole judge of the credibility
of testifying jurors, the trial court does not abuse its discretion in overruling a motion for new 

trial when conflicting evidence exists as to jury misconduct. Id.

 Rule 606(b) provides:

 (b) Inquiry into Validity of Verdict or Indictment. Upon an inquiry into
the validity of a verdict or indictment, a juror may not testify as to any matter
or statement occurring during the jury's deliberations, or to the effect of
anything on any juror's mind or emotions or mental processes, as influencing
any juror's assent to or dissent from the verdict or indictment. Nor may a
juror's affidavit or any statement by a juror concerning any matter about which
the jury would be precluded from testifying be admitted in evidence for any of
these purposes. However, a juror may testify: (1) whether any outside
influence was improperly brought to bear upon any juror; or (2) to rebut a
claim that the jury was not qualified to serve.


Tex. R. Evid. 606(b).

 In attempting to prove that the jury received "other evidence" for purposes of Rule
21.3(f), the defendant is limited by Rule 606(b) to juror testimony on "outside influence." 
See Garza v. State, 82 S.W.3d 791, 794 (Tex. App.--Corpus Christ 2002, no pet.); Hines v.
State, 3 S.W.3d 618, 621 (Tex. App.--Texarkana 1999, pet. ref'd). Rule 606(b) does not
define "outside influence" but civil case law, and more recently criminal case law, has
established that outside influences must originate from sources other than the jury itself. See
Garza, 82 S.W.3d at 794. Information gathered by a juror that is shared with the other jurors
does not constitute outside influence, even if it is shared specifically to influence the other
jurors' votes. Garza, 82 S.W.3d at 794; Hines, 3 S.W.3d at 623. Even a juror's injection of
his own personal experiences, knowledge, or expertise will not be considered as an "outside
influence" because it emanates from inside the jury. Franks v. State, 90 S.W.3d 771, 800
(Tex. App.--Fort Worth 2002, pet. ref'd).

 Appellant acknowledges that the Texas Supreme Court and this Court have held in
civil cases that "outside influence" as used in Rule 606(b) does not encompass outside
influences imparted by a juror. See Golden Eagle Archery, Inc. v. Jackson, 24 S.W.3d 362
(Tex. 2000); Durbin v. Dal-Briar Corp., 871 S.W.2d 263 (Tex. App.--El Paso 1994, writ
denied). But he urges a different interpretation in criminal cases in order to preserve the
defendant's right of confrontation and his right to a fair and impartial trial. Further, he
maintains that adhering to the interpretation of Rule 606(b) espoused in these cases causes
an irreconcilable conflict with Rule 21.3(f).

 Rule 606(b) of the Rules of Evidence, effective on March 1, 1998, permits jurors in
criminal trials to testify about outside influences that affected the juror's decision or to rebut
a claim of disqualification, whereas former Rule 606(b) of the Rules of Criminal Evidence
allowed jurors to testify as to any matter relevant to the validity of the verdict. See Tex. R.
Evid. 606(b); Tex. R. Crim. Evid. 606(b); In re S.P., 9 S.W.3d 304, 308 (Tex. App.--San
Antonio 1999, no pet.); Sanders v. State, 1 S.W.3d 885, 887 (Tex. App.--Austin 1999, no
pet.); Hines, 3 S.W.3d at 629-21. Rule 606(b) has significantly narrowed the matters that
jurors can testify about in criminal cases. S.P., 9 S.W.3d at 308. Jurors in criminal cases are
now limited, as they have always been in civil cases, to testifying about outside influences
and to rebut a claim of disqualification. Id. Consequently, courts have looked to civil cases
to determine what constitutes an outside influence. See id. ; Hines, at 622-23. Appellant's
assertion that Rule 606(b) permits a motion for new trial founded upon an affidavit showing
influence emanating from within the jury cuts against the public policy on which the rule is
based. The rule against a juror impeaching his own verdict, codified in Rule 606(b), is a
traditional rule designed to promote the confidentiality of jury deliberations. State ex rel.
Rosenthal v. Poe, 98 S.W.3d 194, 202 n.12 (Tex. Crim. App. 2003), (citing McDonald v.
Pless, 238 U.S. 264, 268, 35 S.Ct. 783, 785, 59 L.Ed. 1300 (1915)). Rule 606(b) is based on
a public policy which chooses the lesser of two evils: the injury which may occur to the
losing party if jury misconduct goes undiscovered versus the injury to the public if all
verdicts could be attacked by endless inquiry into the jury's deliberative process and by
harassment of individual jurors, thereby destroying the frankness and freedom necessary to
a jury's deliberation. Id.

 The Texas Supreme Court discussed these same policy considerations in Golden
Eagle Archery, Inc. v. Jackson, while upholding the constitutionality of Rule 606(b). 
Consistent with the Court of Criminal Appeals' discussion in Poe, the Court held that public
policy demands that jury deliberations be kept private, because: (1) jurors must be
encouraged to candidly discuss the case during deliberations; (2) jurors must be protected
from post-trial harassment and tampering; (3) disgruntled jurors must be denied an avenue
for overturning the verdict; and (4) there is a need for finality in litigation. Golden Eagle
Archery, 24 S.W.3d at 367. Based on these policy considerations, the Court found that Rule
606(b) does not violate federal due process or the right to a fair and impartial trial under the
Texas Constitution. Id. at 374-75. Intermediate appellate courts have upheld the
constitutionality of Rule 606(b) against similar challenges in the context of criminal cases. 
See Richardson v. State, 83 S.W.3d 332, 362 (Tex. App.--Corpus Christi 2002, pet. ref'd); 
Hicks v. State, 15 S.W.3d 626, 630 (Tex. App.--Houston [14th Dist.] 2000, pet. ref'd); Hines,
3 S.W.3d at 622; Sanders, 1 S.W.3d at 888. Two of these courts have rejected an argument
that Rule 606(b) conflicts with Rule 21.3(f). See Hicks, 15 S.W.3d at 630; Hines, 3 S.W.3d
at 621-22. Finding these authorities persuasive, we likewise reject Appellant's argument that
Rule 606(b) conflicts with Rule 21.3(f).

 The affidavits and live testimony indicate that an "outside influence" was not brought
to bear upon the jury. Therefore, the State's objections based upon Rule 606(b) should have
been sustained by the trial court. In the absence of any proof that the jury received other
evidence, the trial court did not abuse its discretion by overruling the motion for new trial. 
Issue Number Two is overruled.

PROSECUTORIAL MISCONDUCT


 In Issue Number Three, Appellant asserts that the State failed to disclose exculpatory
evidence in four different instances. Under the Due Process Clause of the Fourteenth
Amendment, a prosecutor has an affirmative duty to turn over material, exculpatory evidence. 
Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Ex parte Kimes, 872
S.W.2d 700, 702 (Tex.Crim.App. 1993). Impeachment evidence is included within the scope
of the term "exculpatory evidence." United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct.
3375, 3380, 87 L.Ed.2d 481, 490 (1985). Evidence withheld by a prosecutor is "material"
if there is a reasonable probability that, had the evidence been disclosed to the defense, the
outcome of the proceeding would have been different. Bagley, 473 U.S. at 682, 105 S.Ct.
at 3383; Wyatt v. State, 23 S.W.3d 18, 27 (Tex.Crim.App. 2000). A "reasonable probability"
is a probability sufficient to undermine confidence in the outcome of the trial. Bagley, 473
U.S. at 682, 105 S.Ct. at 3383; Wyatt, 23 S.W.3d at 27. Thus, a due process violation occurs
if a prosecutor: (1) fails to disclose evidence, (2) favorable to the accused, (3) which creates
a reasonable probability of a different outcome. Wyatt, 23 S.W.3d at 27.

A. Medical Records


 Appellant first complains that the State failed to disclose all of Ramirez's medical
records prior to trial. More specifically, he alleges that the State did not provide him with
Dr. Masnyk's notes or the MRI. Prior to trial, the court entered a general order allowing the
inspection of all physical evidence in the possession of the State and providing for disclosure
of any exculpatory evidence. Additionally, the trial court granted Appellant's motions to
inspect all physical evidence and for disclosure of Brady material. The State filed the
medical records in its possession with the trial court clerk, but during trial preparation, the
prosecutor realized that the medical records did not contain Dr. Masnyk's notes. The
prosecutor subsequently filed what she believed to be a complete set of medical records
which included Dr. Masnyk's notes. But during trial, when Dr. Masnyk attempted to refresh
his memory with his notes, Dr. Masnyk stated that his notes were not contained in State's
Exhibit 3. Subsequently, the State subpoenaed the custodian of records from William
Beaumont Hospital, Dorothy Estes, and a complete set of medical records was introduced
without objection as State's Exhibit 3A. Estes made clear that the State had not previously
been provided with a complete set of medical records. Evidence developed at the new trial
hearing established that Appellant's trial attorneys subpoenaed Ramirez's medical records
prior to trial. Dr. Goldstein, who testified on behalf of Appellant, stated that defense counsel
provided him with a "full copy" of the medical records six weeks before trial. Likewise, one
of Appellant's attorneys testified at the new trial hearing that the defense obtained all of the
medical records well in advance of trial pursuant to subpoena. 

 The rule of Brady v. Maryland applies only to information known to the prosecution,
but unknown to the defense. United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397,
49 L.Ed.2d 342 (1976); see Jackson v. State, 552 S.W.2d 798, 804 (Tex.Crim.App.
1976)(holding that the prosecutor did not violate his duty to disclose favorable evidence
where the evidence was known to the defense and in its possession pursuant to subpoena). 
Here, Appellant had the complete medical records in his possession and made use of them
at trial. Under these facts, a Brady violation did not occur.

C. Floorplan of Apartment Complex


 Appellant next asserts that the State's failure to disclose the floorplan of the apartment
complex (State's Exhibit 97) inhibited his ability to cross-examine Appellant's neighbor,
Rebecca Vasquez. During a hearing held outside the jury's presence, the trial court informed
the prosecutor that he would not admit Sx97 because the State had not provided it to the
defense prior to trial. Although made available to him during trial, Appellant did not
introduce the exhibit or utilize it in his cross-examination of the State's witnesses, including
Rebecca Vasquez, who testified after the existence of this exhibit was made known. Further,
he did not request a continuance.

 Significantly, the exhibit has not been made part of the appellate record. Therefore,
Appellant has not shown that it, in fact, is exculpatory. Even assuming the floorplan is
exculpatory, Appellant's Brady claim fails because it was made available to Appellant at trial
in time for him to use it in his defense. See Little v. State, 991 S.W.2d 864, 866
(Tex.Crim.App. 1999); Todd v. State, 911 S.W.2d 807, 818 (Tex.App.--El Paso 1995, no
pet.). Finally, Appellant has failed in his burden to establish materiality. See Lagrone v.
State, 942 S.W.2d 602, 615 (Tex.Crim.App. 1997)(defendant bears the burden of showing
materiality). An appellant can show that evidence withheld by a prosecutor is material only
"if there is a reasonable probability that, had the evidence been disclosed to the defense, the
outcome of the proceeding would have been different." Id. No such showing has been
made.

 C. Family Photographs


 Appellant also argues that the State's failure to disclose a packet of family
photographs gathered by Detective Joe Zimmerly constituted a Brady violation. Zimmerly
collected the photos from the apartment because he believed they showed the relationship
between Appellant, Ramirez, and the child's mother. The State did not make the photos
available to the defense prior to trial, but provided them to the defense during Zimmerly's
testimony. Defense counsel introduced two of the photographs, Defendant's Exhibits 1 and
2, during cross-examination of Zimmerly. These two photographs depicted Appellant
holding Ramirez. At the new trial hearing, defense counsel initially testified that he would
have investigated the other photographs to learn the identity of the people depicted in them,
but then said, "I don't know what I would have done to be honest with you." Appellant does
not explain the exculpatory value of the photographs nor has he shown their materiality. 
Consequently, his arguments are without merit.

D. Criminal History of State's Witnesses


 Finally, Appellant contends that the State's failure to disclose the criminal history of
Rebecca Vasquez, and any agreements it had with her, violated his right to due process. 
After the State concluded its direct examination of Vasquez but before defense counsel began
cross-examination, the State informed counsel that Vasquez was on probation for assault. 
The prosecutors argued that it had not turned over the information because the order only
required that it disclose felony convictions and crimes of moral turpitude, and assault is not
a crime of moral turpitude. During a break, the prosecutors provided the file to defense
counsel who determined that the conviction involved family violence which is a crime of
moral turpitude. The defense then moved to strike Vasquez's testimony because the State
had violated the court's order to provide this information. Additionally, Appellant moved
for dismissal due to a Brady violation. Noting that defense counsel could impeach the
witness with her prior conviction, the trial court denied both requests. Defense counsel
impeached Vasquez with this conviction and also elicited that she was on felony probation
for violation of a protective order. Vasquez agreed with defense counsel that if her probation
was revoked, she was "looking at ten years in prison" and that the District Attorney's office
had control over whether her probation was revoked. Defense counsel did not ask whether
Vasquez had any agreements with the State in exchange for her testimony. At the new trial
hearing, defense counsel testified that he accessed the public records system, which he called
JIMS or CJIS, and found that Vasquez had been arraigned the week prior to trial "for another
assault or some other misdemeanor." Appellant did not offer any evidence regarding the
nature of this offense.

 The record before us reflects that Appellant was provided with the evidence showing
Vasquez's two prior convictions in time to use it effectively as impeachment evidence. 
Appellant chose not to ask Vasquez whether she had any agreements with the State or any
perception that she would be treated favorably in exchange for her testimony, but the defense
established ample facts from which it could argue that Vasquez had a bias to testify favorably
for the State. Consequently, no Brady violation occurred as a result of the State's late
disclosure of these convictions. See Little, 991 S.W.2d at 866.

 Regarding the allegation that the State failed to disclose that Vasquez had been
arraigned the week prior to trial on an unspecified misdemeanor, Appellant has not proven
that there is a reasonable probability that, had the evidence been disclosed to the defense, the
outcome of the proceeding would have been different. Because Appellant failed to establish
materiality, his Brady claim is without merit. Issue Number Three is overruled. 

 Having overruled each of Appellant's issues on review, we affirm the judgment of the
trial court.

August 25, 2004




 RICHARD BARAJAS, Chief Justice


Before Panel No. 3

Barajas, C.J., McClure, and Chew, JJ.


(Do Not Publish)