

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOS. AP-76,953 & 76,954

### IN RE STATE OF TEXAS EX REL. DAVID P. WEEKS, Relator

### ON STATE'S PETITION FOR A WRIT OF MANDAMUS
### AGAINST THE TENTH COURT OF APPEALS
### IN CAUSE NO. 24,083 IN THE 278TH DISTRICT COURT
### OF WALKER COUNTY

**PRICE, J., filed a dissenting opinion in which WOMACK, J., joined.**

### DISSENTING OPINION

### I.

Mandamus is an extraordinary remedy. To intercede in an ongoing capital murder trial and order the trial court to give a particular jury instruction that we believe is raised by the evidence, and modify another jury instruction because we think the trial judge has misconstrued the law, is extraordinary indeed. Shall we interrupt the next capital trial because we think the trial judge has made a legal mistake in admitting certain evidence, or in failing to admit it? Or in granting a continuance, or failing to grant it? In allowing a

capital murder defendant to represent himself, or failing to allow it? Or a hundred other scenarios that routinely present themselves in the course of a capital ligation (or any other criminal trial)? Where will it end?

When defendants seek our interlocutory involvement in such matters, this Court usually declines to intrude, typically refusing even to grant leave to file their applications for mandamus relief. After all, if the trial court makes a mistake in the defendant's eyes, he can ultimately vindicate that mistake in the ordinary course of direct appeal if he is convicted. Because the State's right to appeal is limited, however, the Court sometimes seems more solicitous of its mandamus applications—more willing to interrupt proceedings below and at least file and set the matter for a considered decision. We understandably fear that a trial court's mistake of judgment that cuts against the State's interest may result in an unjust acquittal, and this apparent windfall to the defendant exerts a subtle pressure on the Court to rectify the situation that is all but irresistible. The danger is that we should forget that the necessity for a mandamus applicant to demonstrate he has no adequate remedy to redress the wrong he alleges is but the first prong of the two-prong standard that serves to insure that mandamus is not wantonly invoked to interfere unduly with the ordinary course of judicial proceedings. We run the risk of inadvertently diluting the second prong—the requirement that what the applicant seeks to enforce by our higher authority constitutes a manifestly ministerial act, not a judicial one.

To be sure, we have often characterized a judicial act as "ministerial" for mandamus

purposes when the undisputed facts and circumstances informing it can admit of "but one rational decision under unequivocal, well-settled (i.e., from extant statutory, constitutional, or case law sources), and clearly controlling legal principles."[1] This is meant to be a rigorous standard, however, which should not be invoked to justify routine intrusions in trial-level judicial decisions that seem incorrect to us, or even manifestly incorrect, at least so long as the mistakes occur in the exercise of judicial, not ministerial, functions.[2] That the line separating the two is often indistinct is nothing new. But if we are to err in the exercise of our discretionary mandamus authority, it seems to me, we should make a point of trying to err on the side of non-intrusiveness, even when the State seeks relief that is otherwise unavailable to it in order to avert an apparent injustice. As Judge Meyers, joined by three other judges, forcefully observed almost twenty years ago:

> Plainly, it is the policy of our Legislature that the State not be permitted to appeal judicial rulings in criminal cases except under those circumstances expressly permitted by statute. *See* Tex.Code Crim.Proc.Ann. art. 44.01 (West Supp.1993). If a statute does not allow the appeal of a ruling, then the exercise of our extraordinary writ jurisdiction to review it frustrates the evident design of our statute law, brazenly seizing from the legislative department ultimate authority to determine what is appealable. Such a practice is fundamentally at odds with our form of government. Rather than circumvent the ordinary appellate process, we should instead insist that mandamus not lie merely to evaluate the correctness of court decisions which are not reviewable on appeal,

---

[1] *Bowen v. Carnes*, 343 S.W.3d 805, 810 (Tex. Crim. App. 2011) (quoting *State ex rel. Young v. Sixth Judicial District Court of Appeals*, 236 S.W.3d 207, 210 (Tex. Crim. App. 2007)).

[2] *E.g.*, *Garcia v. Dial*, 596 S.W.2d 524, 529 (Tex. Crim. App. 1980) (writ of mandamus lies to compel entry of a judgment, but not generally to compel entry of a particular judgment).

no matter how plainly erroneous those ruling may seem. Since mandamus is not available to force a particular result in matters calling for the exercise of judgment or discretion anyway, the Court should not invoke absence of an appellate remedy to justify use of its original jurisdiction as a convenient vehicle for the judicial review of otherwise unappealable orders.

Although, in the instant cause, the Court pays lip service to these precepts, its behavior once again parts company with its principles.[3]

I fear that, once again today, the Court merely pays lip service.

## II.

Does the State have a clear right to have the trial court submit the jury instructions it seeks? Although we do not have the entire record of the trial testimony before us, it is apparently undisputed that Falk, the real party in interest, did not personally cause Canfield's death. Understandably, the State wants the trial court to authorize the jury to convict Falk as a party under Section 7.02(a)(2) of the Penal Code.[4] In denying mandamus relief, the court of appeals held that whether the evidence supported such an instruction constituted a manifestly "judicial determination[,]"[5] depending on the trial court's understanding of the testimony and whether the jury could rationally infer that Falk, with the specific intent to promote or assist in the commission of the capital murder of Canfield, solicited, encouraged,

---

[3] *State ex rel. Healey v. McMeans*, 884 S.W.2d 772, 779 (Tex. Crim. App. 1994) (Meyers, J., dissenting).

[4] TEX. PENAL CODE § 7.02(a)(2).

[5] *In re State of Texas ex rel. David Weeks*, ___ S.W.3d ___, 2012 WL 6218205, at *5 (No. 10-12-00443-CR, Tex. App.—Waco, delivered Dec. 12, 2012).

directed, aided, or attempted to aid Martin in killing her.

The trial court was concerned about the testimony of a "Mr. Isaacs," as well as a "witness who was under the shed[.]"[6] Neither the court of appeals nor this Court has been graced with the trial testimony of these two mystery witnesses. What we do have is testimony from two other witnesses, two of the guards (other than Canfield) who were armed and mounted. These witnesses establish that, working in concert, Martin and Falk distracted one of these witnesses, Jeffcoat, and Martin wrested his pistol from him. Martin tossed the pistol to Falk, who then scrambled outside the perimeter fence. There, Falk and Canfield exchanged an undetermined number of pistol shots before Falk approached Canfield's horse. A struggle ensued for the rifle in Canfield's scabbard, which Canfield only relinquished when Falk jammed his pistol into her ribs. The testimony that we have varies with respect to how far Falk then removed himself before the truck that Martin had commandeered struck Canfield's horse.[7] But from the record excerpts that we have before us, it is clear that Falk was retreating.

On this state of the record, the trial judge might have deemed the evidence to be insufficient to justify a rational jury inference that, at the moment the truck struck Canfield's

---

[6] Majority opinion at 3.

[7] Jeffcoat, the guard with the best vantage, testified that Falk was "probably twenty feet" away from Canfield by the time he noticed the truck approaching. The other guard who testified could not estimate the distance because Canfield's horse blocked his line of sight.

horse, Falk still harbored whatever willingness he may have earlier displayed to cause her death.[8]  The record insofar as we have it establishes clearly enough that Falk intended to escape and to aid Martin's escape attempt as well.  But there is no specific showing that he knew Martin had commandeered a truck,[9] much less that Martin would then use it to run into Canfield's horse.  The trial court might conceivably have concluded that the record does not fairly support a jury verdict that Falk specifically intended to promote or assist a capital murder.[10]  Such a conclusion would seem to me to be at the very least debatable.  Like the court of appeals, I cannot say the trial court's judicial determination—that the only theory of

---

[8]

The pistol that Falk jammed into Canfield's ribs was subsequently found on the ground close to Canfield's body.  All of the rounds in the cylinder had been fired.  From this it might be argued that Falk could not have killed Canfield with the pistol by the time he jammed it into her ribs, and that his apparent threat to do so if she did not relinquish the rifle was hollow.  Still, once he secured the rifle, he could have used it to shoot Canfield, but he did not.  From the record that we have, all we can reasonably conclude is that, once he obtained the rifle, Falk retreated.

[9]

Jeffcoat testified that the truck Martin stole belonged to "[t]he guy that works for the sign shop" on an adjacent property, and that it "is always parked in the same spot."  The inference is that Martin and Falk would have noticed the truck there as they worked in the onion field and may have planned to steal it.  But there is no evidence in the record before us to show that the key was in the truck or to suggest that Martin could have distracted Jeffcoat, grabbed his pistol, made his escape through the perimeter fence, got to the truck, hot-wired it, and drove it into Canfield's horse in the minute-and-a-half to two minutes over which Jeffcoat estimated the entire incident transpired.

[10]

From the trial judge's bare comments on the record, Majority Opinion at 3, I cannot say whether this supposition accurately reflects his actual reasoning process.  On direct appeal, however, we will typically uphold a trial court's ruling when it reaches the correct result for the wrong reason. *See, e.g.*, *State v. Ross*, 32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000) ("If the trial judge's decision is correct under any theory of law applicable to the case, the decision will be sustained.").  I should think that this principle would apply in spades in the milieu of mandamus proceedings.  We should be able to say that a trial court's judicial decision is not only unjustified, but *unjustifiable*, before we are willing to hold that he had a *ministerial* duty to decide otherwise.

party liability available to the State to establish Falk's complicity for capital murder was the conspiracy theory authorized under Section 7.02(b) of the Penal Code—was so manifestly off-base as to justify mandamus relief. I certainly would not slam on the brakes in the middle of a capital murder trial—especially at the point at which the jury has heard all of the evidence and awaits only instruction from the trial court and argument of the parties before retiring to deliberate—in order to address the question.

### III.

The trial judge's proposed party instruction under Section 7.02(b) would require the State to prove that Falk should have anticipated that, in the course of carrying out the conspiracy to escape, Martin would commit the capital murder of Canfield in the particular manner in which he did—namely, by striking her horse with a truck. The court of appeals offered its "strong opinion" that this was an unjustified construction of the law, but held that the question is nevertheless one of "first impression" and therefore not "well-settled" law so as to authorize relief under the second prong of the standard for mandamus relief.[11] Today this Court disagrees, citing two cases for the proposition that mandamus may sometimes be appropriate to resolve issues of first impression.[12] But in each of those cases we regarded the meaning of the governing statute, if not altogether plain from the statutory language, to be

---

[11]

*Weeks*, *supra*, at *8 & n.8.

[12]

*State v. Patrick*, 86 S.W.3d 592 (Tex. Crim. App. 2002); *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194 (Tex. Crim. App. 2003).

sufficiently "clear and undisputable" to entitle the State to the mandamus relief it sought.[13]

Here, the Court does not purport to rely on the "clear and indisputable" meaning of Section 7.03(b) itself to establish that the trial judge's proposed instruction is unauthorized. Instead, it relies upon "well-established evidentiary sufficiency principles" to conclude that the State has a "clear right" to the Section 7.02(b) jury instruction *sans* the trial judge's gloss.[14] But these "principles" do not derive from the language of the statute itself, and there is no case law directly on point. To reach its desired result, the Court must extrapolate from existing (and relatively new) case law—it must *extend* those "well-established evidentiary sufficiency principles"—to the particular question at hand to justify its conclusion.[15] I agree with the court of appeals that applying even well-settled legal "principles" to novel fact

[13]

    *Poe*, *supra*, at 201-02; *Patrick*, *supra*, at 595.

[14]

    Majority Opinion at 14.

[15]

    Both the trial court and the State were operating under the presumption that the indictment alleged that Canfield's death was caused by a particular manner and means, namely, by striking the horse she was riding with a deadly weapon, to wit, a motor vehicle. Less than a year ago we held, in *Johnson v. State*, 364 S.W.3d 292 (Tex. Crim. App. 2012), that a variance in the particular manner and means by which an appellant committed an aggravated assault did not cause the State's proof to be legally insufficient. Although *Johnson* did not involve a murder prosecution, the reasoning by which we arrived at our conclusion would most likely apply in the context of a prosecution for capital murder. *See id*. at 296, 298 (observing that variances with respect to the manner and means by which a murder is accomplished do not implicate legal sufficiency). But we have not explicitly said so. Nor have we explicitly said in any case that what applies to determining the legal sufficiency of the primary allegation would apply equally to determining the legal sufficiency of the evidence to establish party liability under Section 7.02(b). It is therefore likely that both the trial judge and the State were operating under a presumption that will not be borne out by post-*Johnson* jurisprudence. But that is a question of law the answer to which has not, until today, been firmly resolved by either statute or case law.

scenarios is manifestly a judicial function, not subject to mandamus compulsion.

**IV.**

Granting mandamus relief under these circumstances only serves to encourage prosecutors to seek what amounts to an interlocutory appeal whenever a trial court's ruling during the course of a trial displeases them. Interlocutory appeals are generally disfavored;[16] interlocutory appeals that allow the State to circumvent the legislative will with respect to what judicial rulings the State should be able to challenge *at all* on appeal are all the more objectionable.[17] And when the enterprise moreover necessitates the interlocutory generation of a transcript of large portions (but not all) of the court reporter's notes and due consideration of an incomplete record by, not one, but two higher courts, while a jury that has heard all of the evidence has been sent home to cool its heels—that is all the more reason to refuse to exercise our discretionary authority even to entertain the application, much less grant mandamus relief.[18] I respectfully dissent.


FILED:      January 16, 2013
PUBLISH

---

[16] *Ex parte Doster*, 303 S.W.3d 720, 724 (Tex. Crim. App. 2010).

[17] *McMeans*, *supra*, at 779 (Meyers, J., dissenting).

[18] George E. Dix & John M. Schmolesky, 43B TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 61:3, at 930 (3rd ed. 2011).